**COMMERCIAL UNION ASSURANCE COMPANY, Plaintiff,**

v.

**Peter PUCCI and Carmella Scalese Pucci, his wife, Lena Scalese, Eleanor Scalese, Dorothy Scalese, Fred Scalese, Victor Scalese, Arthur Scalese, Mary Scalese Alemanno, Rose Scalese Caputo and Nicola Scalese, Defendants.**

Civ. A. No. 80–1092.

United States District Court, W. D. Pennsylvania.

Oct. 14, 1981.

Content is fully redacted.

Robert Kunselman, Reed, Luce, Good, Tosh, Kunselman & McGregor, Beaver, Pa., for plaintiff.

Andrew M. Schifino, Pittsburgh, Pa., for Rose Scalese Caputo.

Robert J. Taylor, Ambridge, Pa., for Peter Pucci, Carmella Scalese Pucci, and Mary Scalese Alemanno.

Alex A. Gaynes, Gaynes & Rockafellow, P.C., Tuscon, Ariz., for other defendants.

## OPINION

COHILL, District Judge.

### I.

### *Nature of the Dispute*

Peter Pucci and Carmella Scalese Pucci resided in a single-family dwelling at 249 Merchant Street in Ambridge, Pennsylvania from the time of their marriage in 1932 until February 21, 1979. On the latter date, a natural gas explosion in an adjacent building caused extensive blast and fire damage to the Puccis' residence. Since the accident, the Puccis have lived with their daughter and son-in-law.

The Puccis had insured their residence against loss from fire through a homeowner's policy issued by Commercial Union Assurance Company. The basic policy coverages that were in effect on the date of the loss insured the dwelling in the amount of $40,000, appurtenant structures in the amount of $4,000, personal property in the amount of $20,000, and loss of use in the amount of $8,000. The Puccis filed a timely proof of loss statement with Commercial Union, in which they asserted a claim in the amount of $29,143 for damage to the dwelling, $8,626.41 for loss of personal property, and $1,800 for additional living expenses. The policy contained a loss deductible clause in the amount of $100. Thus, the net amount of the Puccis' claim was $39,469.41.

Commercial Union promptly paid the Puccis' claims for loss of personal property and for additional living expenses. It declined to satisfy the claim for damage to the dwelling, however, after learning on February 22, 1979 that the Puccis probably were not the sole owners of the house. Desiring to avoid the possibility of incurring multiple liability to the probable co-owners of the damaged dwelling, Commercial Union paid the amount in dispute into the registry of this Court and filed an interpleader action pursuant to 28 U.S.C. § 1335 (1976). The complaint in interpleader names nine individuals, in addition to the Puccis, as defendants. The insurer asks the Court to determine the actual cash value of the damaged portion of the dwelling at 249 Merchant Street and to determine the legal rights of the alleged co-owners in the proceeds of the insurance policy.

The Puccis filed an answer to the complaint in interpleader, alleging that they are the only legitimate claimants to the insurance proceeds, that the explosion and fire actually caused damage to the dwelling in the amount of $44,848, and that the insurer acted improperly when it filed the interpleader action. In addition, they asserted a counterclaim for punitive damages arising from the insurer's allegedly unjustifiable refusal to satisfy their claim on the policy.

Four other individuals also filed answers to the complaint in interpleader. Eugene R. Caputo, administrator of the estate of Rose Scalese Caputo, alleged in his answer that he is a legal and equitable owner of the Merchant Street residence, that the explosion and fire caused a reduction in the value of his interest in the property, that he is entitled to receive a portion of the proceeds from the insurance policy, and that Peter and Carmella Pucci are trustees of the proceeds from the insurance policy for the benefit of the estate of Rose Scalese Caputo. Fred Scalese, Victor Scalese, deceased, through his surviving spouse, and Arthur Scalese, deceased, through his surviving spouse, filed a joint answer to the complaint in interpleader, in which they alleged that all three of them have a proprietary interest in the Merchant Street dwelling, that Peter and Carmella Pucci have no ownership interest in the property, and that all three of them are entitled to a portion of the proceeds from the insurance policy.

Counsel for the Puccis moved for an expedited hearing, which we granted. At the evidentiary hearing, counsel for the insurer called a claims adjuster as his only witness; counsel for the Puccis called Peter and Carmella Pucci, the Puccis' son-in-law and a building contractor; and counsel for the four other active claimants did not call any witnesses. Pursuant to Federal Rule of Civil Procedure 52(a), we now make the following findings of fact and conclusions of law.

## II.

### *Ownership Interest in the Dwelling*

#### A. *Last Will and Testament of Nicola Scalese*

Nicola Scalese and his wife, Paulina, purchased the three-story, frame dwelling at 249 Merchant Street in 1918. Paulina Scalese died on November 24, 1922; Nicola thereby became sole owner of the dwelling as the surviving tenant by the entireties. Nicola Scalese subsequently intermarried with Filomena Scalese. His two marriages produced a total of twelve children. In 1932, one of Nicola's daughters, Carmella, married Peter Pucci. At the invitation of Nicola, the newlyweds lived in two upstairs rooms in the Merchant Street house.

Nicola Scalese died on October 17, 1933. His last Will and Testament read in pertinent part as follows:

> I give and devise my real estate situate at No. 249 Merchant Street, Ambridge, Pennsylvania to my wife, Filomena Scalese for life and after her death then to be divided equally among the children, i. e. my children living at the time of my death, and if any of my children shall die before my wife, Filomena Scalese, then each of my children dying before my wife shall have the power to appoint his share to such person or persons as he or she will see fit, and in lieu of the exercise of such appointment the share of such child dying before my wife, Filomena Scalese, shall be divided equally among the children living at the death of my wife and those persons whom a deceased child has appointed, the same as if said deceased child or children had been living at the death of my wife.
>
> . . . .
>
> I appoint my wife, Filomena Scalese executrix and my son James Scalese, executor of my estate and I appoint Felomena Scalese and James Scalese guardian of my minor children, to serve as executrix, executor and guardian, without bond.

Pl. Exh. 2. Only one of Nicola's twelve children, Dominic, predeceased his father.

Prior to Nicola's death, all of the children had moved out of their father's home except Victor and Carmella. Filomena remarried in 1935, continued to live in the Merchant Street house for six months following her remarriage, and then moved elsewhere. Victor also moved elsewhere sometime during the mid-1930's.

When Filomena vacated the house in 1936, the taxes and insurance premiums were in arrears, and the house was in need of a significant amount of maintenance work. James Scalese, Carmella's brother and the executor of Nicola's Last Will and Testament, asked Peter and Carmella Pucci to remain in the house and to take care of it. Peter Pucci initially balked at the request, but his wife ultimately convinced him that they should maintain the family homestead.

From 1936 until 1979, the Puccis had sole possession of the Merchant Street house. During those forty-three years, the Puccis paid the property taxes and the insurance premiums on the house, performed maintenance, added a back porch and remodelled the interior. Neither Filomena nor any of Carmella's siblings ever contributed services or money toward the maintenance or the improvement of the residence. For a time, the Puccis rented out a room. They did not distribute any portion of the rent proceeds to the other devisees.

Most of Carmella's siblings visited the Puccis at the Merchant Street residence on one or more occasions. Some of them complimented Peter Pucci on the appearance of the house and all of them appeared to be

pleased that the Puccis had continued to maintain the family homestead. No one ever attempted to assert a right to participate in the management of the house or demanded that the Puccis pay rent to the other devisees in return for their use of the house.

Filomena Scalese's life estate interest in the dwelling terminated with her death on May 17, 1972. James and Ernest Scalese, two of the eleven children who survived their father, predeceased Filomena. No party who appeared at the hearing presented any evidence on the question of whether or not either of these two children had exercised the power of appointment that Nicola's Last Will and Testament had granted to them. Five of the nine children who survived Filomena have asserted claims in this Court for some portion or all of the proceeds from the Commercial Union insurance policy. The insurer filed this interpleader action for the sole purpose of avoiding multiple liability. Commercial Union has admitted that it owes some person or persons the full amount of the actual cash value of the damaged portion of the dwelling or the policy coverage limit of $40,000, whichever figure is lower. Thus, we need decide only two questions in this interpleader action. First, who among the devisees has a legal right to receive some portion of the proceeds from the insurance policy? Second, what is the actual cash value of the damaged portion of the house?

*B. Adverse Possession*

The Puccis allege that they acquired sole ownership of the property at issue through adverse possession. They therefore argue that they alone are legally entitled to benefit from the insurance policy because they alone have an insurable interest in the property.

"[O]ne who claims title by adverse possession must prove that he had actual, continuous, exclusive, visible, notorious, distinct, and hostile possession of the land for twenty-one years. Each of these elements must exist, otherwise the possession will not confer title." *Conneaut Lake Park, Inc. v. Klingensmith*, 362 Pa. 592, 594–95, 66 A.2d 828, 829 (1949) (citations omitted). *See Burns v. Mitchell*, 252 Pa.Super. 257, 262, 381 A.2d 487, 489 (1977). *Cf.* 42 Pa.Cons. Stat.Ann. § 5530(a) (West Pamphlet 1981) (statute of limitations). Mr. and Mrs. Pucci undeniably had actual, continuous, exclusive, visible, notorious and distinct possession of the dwelling at 249 Merchant Street for a period in excess of twenty-one years. The critical issue, however, is whether or not the Puccis' possession was hostile or adverse to the interests of the other devisees in the property. At the time of Nicola Scalese's death, the house was occupied by Filomena Scalese, Victor Scalese, and Peter and Carmella Pucci. After Filomena Scalese moved out in 1936, James Scalese asked the Puccis to continue to live in the house and to take care of it. The other devisees likewise felt that the Puccis should maintain the family homestead. Although the evidence conclusively established that Carmella Pucci's siblings wanted her to continue to reside in the house, we heard no evidence that indicated that any of the devisees intended to convey his or her interests in the property to the Puccis.

The Pennsylvania Supreme Court has held that "[w]here the possession, at its inception, *is permissive* the statute will not begin to run against the real owner *until there has been some subsequent act of disseizin or open disavowal of the true owner's title,* .... The burden is upon the person claiming by adverse possession to establish when his adverse holding *began.*" *Moser v. Granquist*, 362 Pa. 302, 304–05, 66 A.2d 267, 268 (1949) (citations omitted) (emphasis in original). *See Roman v. Roman*, 485 Pa. 196, 401 A.2d 361 (1979). *Cf. Gee v. CBS, Inc.*, 471 F.Supp. 600, 655 (E.D.Pa.), *aff'd mem.*, 612 F.2d 572 (3d Cir. 1979) ("hostility" means that true owner has not consented to the possession). In *Hanley v. Stewart*, 155 Pa.Super. 535, 39 A.2d 323 (1944), the Superior Court of Pennsylvania applied this legal principle to facts that were very similar to the facts that now confront us. The plaintiff in the *Hanley* case filed a bill in equity against her cotenants asking for a

partition of a farm. One of the defendants opposed the bill on the ground, *inter alia*, that her predecessor in interest had acquired title to the entire property through adverse possession. The predecessor in interest had been the unmarried daughter of Cornelius Sullivan. When Mr. Sullivan died intestate, his four children inherited the farm as tenants in common. The unmarried daughter, who was the only offspring living on the farm at the time of the father's death, made her permanent residence on the farm. She collected the receipts from the crops, paid the taxes, made improvements and had exclusive possession of the farm for more than twenty-one years following her father's death.

The Superior Court observed that "[a]n unmarried daughter, living with her parents, is frequently allowed by her coheirs, after their father's or their parents', death, to remain in possession of the homestead, and receive the crops and profits, just as in the lifetime of their parents, without thereby surrendering or being deprived of their interest in the land. . . ." 155 Pa.Super. at 543, 39 A.2d at 327. Therefore, the court concluded that

> adverse possession, if by a coheir or cotenant, does not begin to run until there is an actual ouster of the other heirs, or some clear, unequivocal act or declaration by the coheir or cotenant in possession, brought home to the remaining coheirs and cotenants, showing a claim of exclusive ownership of the whole, amounting to, or the equivalent of, an ouster of the other coheirs and cotenants.

*Id.* at 545, 39 A.2d at 328. After failing to find in the facts any unequivocal declaration of exclusive ownership of the whole, the court held that the unmarried daughter had not acquired title to the entire farm by adverse possession.

Likewise, we find no indication in the evidence that the Puccis ever had made an effort to oust the other devisees or ever had communicated to them a claim of exclusive ownership of the family homestead. In fact, Mrs. Pucci indicated at the hearing that she never had any intention of ousting the other devisees. On cross-examination, she testified as follows:

> Q Was there any time from the time that you entered into this arrangement to take care of the house—Was there ever any time that you told any of your brothers or sisters either verbally or in writing that you were asserting full ownership rights excluding them from the premises?
>
> A I never felt that way about it, never. They have a share just like I do in that house.

Therefore, we hold that at least nine individuals had an ownership interest in the Merchant Street dwelling at the time of the explosion and fire.

### III.

### *Legal Right to Proceeds from Insurance Policy*

Our conclusion that nine or more persons had an ownership interest in the Scalese homestead at the time of the loss does not necessarily mean that nine or more persons have a legal right to some portion of the proceeds from the homeowner's insurance policy. Peter and Carmella Pucci did not consult with any of the other devisees before obtaining the insurance policy from Commercial Union. They alone paid the insurance premiums. They alone are named as the "insured" in the policy. In fact, Commercial Union did not know that any other party had an ownership interest in the dwelling until the day after the loss occurred.

In *Spires v. Hanover Fire Insurance Company*, 364 Pa. 52, 70 A.2d 828 (1950), the Pennsylvania Supreme Court stated that "[a] policy of fire insurance is a personal contract of indemnity against such loss as the *insured* may sustain; the insurance is not of the property as such, but of the *interest of the insured in* the property." *Id.* at 56, 70 A.2d at 830 (citations omitted) (emphasis in original). The *Spires* case involved an attempt by lessors to enforce a contract of insurance that their lessee had obtained in her and her partner's names only. The plaintiffs had leased an airfield, including an airplane hangar, to Mary E.

Kaehler. The lease provided that the lessee would maintain the hangar in " 'good condition and proper repair' " and would insure it against loss by fire. *Id.* at 54, 70 A.2d at 829. The lessee obtained a fire insurance policy from Hanover Fire Insurance Company that covered the hangar, the personal property that the lessee was storing in the hangar, and other property on the airfield that the lessee owned.

A fire subsequently destroyed the hangar and its contents. The lessee filed a claim with the insurance company for the loss of her personal property, and the insurer eventually settled that claim. The lessee refused to submit a claim for the loss of the hangar, however, even though the lease required the lessee to return the hangar to the lessors in good repair at the termination of the lease. The lessors then filed a proof of loss for the hangar directly with the insurance company. After the insurer declined to recognize that claim, the lessors brought an action against the insurer to enforce the insurance contract.

Affirming the trial court's decision to dismiss the case, the Pennsylvania Supreme Court held that the lessors had no legal basis for maintaining an action against the lessee's insurer. The court gave four reasons for its ruling. First, the lessors could not reasonably contend that the policy was primarily for their benefit. The lessee had a paramount interest in the insurance policy because she owed a contractual obligation to the lessors to return the hangar to them in good condition. 364 Pa. at 55–56, 70 A.2d at 830. She obtained the insurance policy in order to protect her ability to satisfy her duty to the lessors. Second, "[t]o be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract." *Id.* at 56–57, 70 A.2d at 830 (emphasis in original). *See Line Lexington Lumber & Millwork Company, Inc. v. Pennsylvania Publishing Corp.*, 451 Pa. 154, 160–61, 301 A.2d 684, 688 (1973). Hanover Fire Insurance Company did not know of either the lease or the lessors' interest in the property when it issued the insurance policy to the lessee. "The fact . . . that plaintiffs would be incidentally benefited would not give them a right to recover on the policy by virtue of any arrangement between them and Kaehler where the Insurance Company assumed no obligation to them in the policy but believed itself to be insuring only the interest of the persons named therein." 364 Pa. at 57, 70 A.2d at 831. Third, an insurer has a right to choose the persons to whom it will issue policies covering particular risks. *Id.* at 58–59, 70 A.2d at 831. Hanover Fire Insurance Company voluntarily chose to insure the lessee and her partner. It did not have the opportunity, however, to decide whether or not it wished to insure the lessors. In a concurring opinion, Chief Justice Maxey stated on this point that "[e]ven *if* when Kaehler and [her partner] executed the insurance policy with the defendant they regarded themselves as agents of Spires and his wife, but that fact had not been disclosed to the insurance company, the company would not be obligated to those undisclosed principals." *Id.* at 60, 70 A.2d at 835 (emphasis in original). Fourth, a court should not defeat an insurer's expectation of conducting business with only one party. *Id.* at 59, 70 A.2d at 831–32. An insurer will incur unanticipated and uncompensated costs if it must negotiate a settlement and obtain a release from a previously undisclosed third-party.

The court's ruling did not leave the lessors without a remedy, however. They could sue the lessee to enforce the provision in the lease that required the lessee to return the hangar to the lessors in good condition and proper repair. A court of equity could order the lessee to submit to the insurance company a proof of loss for the hangar, to receive the proceeds from the policy in the capacity of a constructive trustee for the lessors, and to pay over the proceeds to the lessors. *Id.*, 70 A.2d at 832 (citing *Dubin Paper Co. v. Insurance Company of North America*, 361 Pa. 68, 63 A.2d 85 (1949)). *Cf. Insurance Company of*

*North America v. Alberstadt*, 383 Pa. 556, 559–61, 119 A.2d 83, 85–86 (1956) (insured may retain only that portion of insurance proceeds that compensates her for loss to her actual interest in property; insured holds remainder of proceeds as constructive trustee for others who have interest in property).

Applying the analysis of the *Spires* decision to the present case, we conclude that only the Puccis have a legal right to assert a claim against Commercial Union for a loss under the homeowner's policy. First, the evidence indicates that the Puccis obtained the homeowner's policy primarily to protect their residence rather than to protect the ownership interests of all of the devisees. The Puccis resided in the Merchant Street dwelling for over forty years. They knew that they would have to obtain alternate housing if the dwelling ever was destroyed. Second, the other devisees cannot be third-party beneficiaries of the insurance policy. When Commercial Union issued the insurance policy, it did not know that anyone other than the Puccis had a proprietary interest in the dwelling and it did not intend to issue the policy for the benefit of the other devisees. Third, Commercial Union never had the opportunity to choose to insure the interests of the other devisees. Finally, the insurer had the expectation that it would conduct any business involving the policy with just one party—the Puccis. Therefore, we hold that the devisees, other than Carmella Pucci, have no legal basis for asserting a claim against Commercial Union for a portion of the proceeds from the insurance policy.

Nevertheless, those devisees who are not in privity with Commercial Union may be able to successfully advance an equitable claim against the Puccis for a portion of the proceeds from the insurance policy. When Filomena Scalese moved out of the family homestead in 1936, the taxes and the insurance premiums were in arrears. James Scalese, with the approval of his siblings, asked the Puccis to remain in the house and to take care of it. If the devisees can prove that the Puccis received the rent-free use of the residence in return for maintaining the family homestead, they may have valid equitable claims to shares of the insurance proceeds. We will not decide this issue today, however, for three reasons. First, the merits of the devisees' equitable claims are unrelated to the legal issues that are raised by Commercial Union's complaint in interpleader and by the Puccis' counterclaim against Commercial Union. Second, the testimony given by the witnesses at the expedited hearing did not focus on the circumstances under which the Puccis continued to reside in the dwelling after Filomena Scalese moved elsewhere. Third, perhaps as a result of the short notice and the distances involved, none of the claimants, other than Carmella Pucci, appeared in person at the expedited hearing. The attorney for Fred Scalese, the surviving spouse of Victor Scalese and the surviving spouse of Arthur Scalese also could not attend the hearing because of a prior commitment, although local counsel did appear to represent the interests of these three claimants. None of the parties called as a witness any of the devisees other than Carmella Pucci. Thus, we do not have before us an evidentiary record that would permit us to evaluate the merits of the devisees' equitable claims. If any of the devisees wish to assert formal equitable claims against the Puccis for a share of the insurance proceeds, they may do so in an independent action.

## IV.

### *Actual Cash Value of Loss*

Having concluded that only the Puccis have a legal right to assert a claim under the homeowner's policy, we now must determine the actual cash value of the loss to the Merchant Street dwelling. On the basis of a jury verdict and a judgment in the Court of Common Pleas of Beaver County, Pennsylvania, Commercial Union argues that the doctrine of collateral estoppel precludes the Puccis from receiving any more than $25,000 for damage to the dwelling. The Pennsylvania Supreme Court has stated "that a plea of collateral estoppel is

valid if 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." *Safeguard Mutual Insurance Company v. Williams*, 463 Pa. 567, 574, 345 A.2d 664, 668 (1975). *Accord, Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 844–45 (3d Cir. 1974).

The Puccis, through the same counsel who has represented them in the present case, filed an action in trespass against Columbia Gas of Pennsylvania, Inc. in the Court of Common Pleas of Beaver County on July 15, 1980. In their complaint, the Puccis alleged, *inter alia*, that Columbia Gas negligently constructed and maintained its service lateral pipe and appurtenant equipment that supplied natural gas to the building adjacent to 249 Merchant Street, that a gas leak occurred as a result of this negligence, that an explosion and fire occurred as a result of the leak and through no fault of the plaintiffs, and that the explosion and fire damaged the dwelling at 249 Merchant Street in the amount of $44,848.00. The complaint explicitly placed into issue the value of the damaged portion of the dwelling. Counsel for the plaintiffs had a full and fair opportunity to present evidence on the issue.

On March 26, 1981, a jury returned a verdict in favor of the plaintiffs and awarded them $25,000 for damage to the dwelling. Dissatisfied with the relatively low amount of the award, the Puccis filed a motion for a new trial. The Court of Common Pleas, sitting en banc, denied the plaintiffs' motion on September 28, 1981.

All four of the prerequisites for applying the doctrine of collateral estoppel have been satisfied in the present case. First, the party against whom the defense of collateral estoppel is being asserted was the same party who prosecuted the prior action. Second, the Puccis had a full and fair opportunity in the prior adjudication to litigate the issue of the monetary value of the damage to the dwelling. Third, the issue that the jury decided in the prior adjudication was identical to the issue now in question. Fourth, the prior adjudication resulted in a final judgment on the merits and the resolution of the issue now in question was an essential component of that judgment. Although the Puccis have not yet decided whether to take an appeal from the judgment of the court of common pleas, we need not delay further the entry of this opinion and order because the pendency of an appeal would not affect the finality of the judgment for the purpose of applying the doctrine of collateral estoppel. *Cf. In re Meade Land & Development Co., Inc.*, 1 B.R. 279, 283 (E.D.Pa.1979) (under Pennsylvania law, a judgment is final even though an appeal has been taken, if the party who initiated the appeal has not filed a supersedeas bond); *Wallace's Estate*, 316 Pa. 148, 153, 174 A. 397, 399 (1934) ("when a court of competent jurisdiction has determined a litigated cause on its merits, the judgment entered, until reversed, is, forever and under all circumstances, final and conclusive as between the parties to the suit"); *Elkin's Petition*, 289 Pa. 327, 329, 137 A. 459, 460 (1927) ("[a]n appeal from a final judgment of the court of common pleas does not disturb the finality of that judgment while it remains unreversed"); *Woodward v. Carson*, 86 Pa. 176, 178 (1878) (writ of error does not destroy effect of judgment); *Restatement of Judgments* § 41, Comment d (1942) ("[a]t common law a pending writ of error does not vacate a judgment"). *See also Reed v. Allen*, 286 U.S. 191, 199, 52 S.Ct. 532, 533, 76 L.Ed. 1054 (1932) ("where a judgment in one case has successfully been made the basis for a judgment in a second case, the second judgment will stand as *res judicata*, although the first judgment be subsequently reversed"). Therefore, applying the doctrine of collateral estoppel, we adopt as conclusive in this case the finding of the Court of Common Pleas of Beaver County that the actual cash value of the damage sustained by the dwelling at 249 Merchant Street was $25,000.

■ The Puccis contend that they are entitled to recover from the insurer not only the monetary value of the damage to the house, calculated as of the date of the loss, but also the increase in the cost of repair that is attributable to inflation, covering the period from the date of the loss to the present. Commercial Union denies that the terms of the homeowner's policy require it to indemnify the insured for the devaluation of the insurance proceeds when a delay in payment is the result of a good faith dispute between the insurer and the insured.

The policy that Commercial Union issued to the Puccis read in pertinent part that "this Company's liability for loss . . . shall not exceed . . . the actual cash value of that part of the building structure damaged or destroyed." Def.Exh.C. The Pennsylvania Supreme Court has stated that "[a]ctual cash value in a policy of insurance means what it would cost to replace a building or a chattel as of the date of the fire." *Fedas v. Insurance Company of Pennsylvania,* 300 Pa. 555, 562, 151 A. 285, 288 (1930). We have found no Pennsylvania case that conflicts with the law as stated in *Fedas* or that calculates the cost of repair as of the date of the judicial award rather than as of the date of the loss. Therefore, we hold that the Puccis are entitled to recover from Commercial Union only the cost of repair as of the date of the loss, which the judgment of the court of common pleas conclusively has established as $25,000.

■ Although the term "actual cash value" does not include the post-loss effects of inflation on the cost of repair, the Puccis are entitled to receive interest on the actual cash value to compensate them for the delay in the availability of the insurance proceeds. *Cf. Formigli Corp. v. Fox,* 348 F.Supp. 629, 648 (E.D.Pa.1972) ("[w]hen money is due a person under a contract but is improperly withheld or unpaid by the defendant, the party to whom such money is due is entitled to interest from the time it was due"). The Puccis' insurance policy provided in relevant part that "[t]he amount of loss for which this Company may be liable shall be payable sixty days after proof of loss . . . is received by this Company and ascertainment of the loss is made." Def.Exh.C. Mr. Pucci presented Mr. Edward Wallace, Commercial Union's claims adjuster, with a sworn statement in proof of loss on March 27, 1979, and Mr. Wallace already had evaluated the loss personally. Thus, under the terms of the policy, the Puccis were entitled to receive compensation for damage to the dwelling on or before May 27, 1979. We will award the Puccis interest on the insurance proceeds of $25,000 for the period from May 28, 1979 to the present. *Cf. John Conlon Coal Co. v. Westchester Fire Insurance Co.,* 16 F.Supp. 93, 96–97 (M.D.Pa.1936), *aff'd,* 92 F.2d 160 (3d Cir.), *cert. denied,* 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 581 (1937) (insured entitled to interest from date of fire where policy does not contain provision extending time for payment and insurer completely denies its liability for the loss). The legal rate of interest in Pennsylvania is six percent per annum. 41 Pa.Stat.Ann. § 202 (Purdon's Supp. 1981–82).

## V.

*Counterclaim for Punitive Damages*

■ Peter and Carmella Pucci have asserted a counterclaim against Commercial Union for punitive damages arising from various aspects of the insurer's handling of the Puccis' claim. The insurer admits that the policy that it had issued to the Puccis was in effect at the time of the explosion and fire and that the policy's coverage extended to the type of loss that occurred. Commercial Union denies, however, that it acted improperly when it declined to satisfy the Puccis' claim for damage to the dwelling, and instead, filed a complaint in interpleader.

On February 22, 1979, the day after the explosion and fire, Mr. Edward Wallace, the insurer's claims adjuster, visited the damaged dwelling. In a conversation with Mr. Pucci, Mr. Wallace learned that persons other than the Puccis might have an ownership interest in the property. Mr. Pucci explained that Nicola Scalese had devised

the property to his children, but that only he and his wife had resided in the house since 1936. Mr. Pucci gave Mr. Wallace the names of all of the devisees.

Mr. Wallace returned to the property three days later and told Mr. Pucci that he had good news. He stated that the Puccis had been in exclusive possession of the house for such a long period of time that they had acquired sole title to the property by adverse possession, and therefore, the insurance company would satisfy the Puccis' entire claim. Mr. Wallace subsequently gave Mr. Pucci a blank proof of loss form and an unsigned subrogation receipt in the amount of $39,469.41. The Puccis completed and signed the proof of loss statement and signed the subrogation receipt. They had both documents notarized.

The Puccis expected to settle their entire claim with Commercial Union on March 27, 1979. Although Mr. Wallace delivered a check on that date for the loss of personal property and for additional living expenses, he told the Puccis that the insurer had decided that it could not satisfy their claim for damage to the dwelling because they had only a fractional ownership interest in the property. Mr. Wallace advised Mr. Pucci to obtain an attorney.

The Puccis contend that the insurer's course of conduct amounted to an intentional infliction of emotional distress and violated several provisions of the Unfair Insurance Practices Act, 40 Pa.Stat.Ann. §§ 1171.1–1171.15 (Purdon's Supp. 1981–82). We hold that the Puccis have neither a factual nor a legal basis for their attempt to recover punitive damages from Commercial Union. First, we find that the insurer did not act unreasonably or in bad faith. When Commercial Union issued the homeowner's policy to the Puccis, it believed that the Puccis were the sole owners of the dwelling at 249 Merchant Street. For some unexplained reason, Mr. Pucci did not inform the insurer until after the loss that individuals other than the Puccis might have an ownership interest in the house. Thus, Commercial Union suddenly was confronted with two conflicting concerns on February 22, 1979: the policyholders, who had been burned out of their residence, were in need of financial assistance, but the existence of other devisees raised the possibility of expensive litigation and multiple liability. *Commercial Union promptly investigated* the title for the property. Based on this investigation, the insurer initially decided that the Puccis had acquired exclusive title to the property through adverse possession, and therefore, that it could satisfy the Puccis' claim without substantial risk. It subsequently decided, however, that the issue of title was uncertain.

■ Although this reversal by the insurer of its decision undoubtedly has caused the Puccis a substantial amount of inconvenience and mental anguish, the Puccis have no ground on which to complain about the reversal. The Puccis placed the insurer in the dilemma by failing to inform Commercial Union of the fractional interests in the property when they first obtained the homeowner's policy. As our earlier discussion of the Puccis' adverse possession argument indicates, the question of who now has an ownership interest in the dwelling was not an easy one for Commercial Union to answer on short notice. Although the Puccis obviously were disappointed by Commercial Union's reversal of its decision to accept the Puccis as the exclusive owners of the property, they had not relied to their detriment on the insurer's initial willingness to satisfy their claim. Therefore, Commercial Union was not estopped from declining to pay the Puccis or from filing the interpleader action. *Cf. DeRosa v. St. Paul Insurance Co.,* 120 P.L.J. 99 (C.P. of Allegheny County 1971), *aff'd mem.,* 222 Pa.Super. 424, 295 A.2d 157 (1972) (insurer estopped from denying coverage after its representative admitted liability and arranged for repairmen and after insured paid repairmen for their work); J.A. Appleman & J. Appleman, 16B *Insurance Law and Practice* § 9088, at 557 (1981) (insurer estopped from denying liability where, by its course of dealing or its open actions, it has induced insured to pursue a course of conduct to his detriment). Commercial Union has shown

its good faith by satisfying the Puccis' claims for loss of personal property and for additional living expenses and by admitting liability in this interpleader action for the full amount of the actual cash value of the damaged portion of the house. Therefore, we find that the Puccis' claim for punitive damages lacks a factual basis.

 Even if our evaluation of the facts is incorrect, however, we still would deny the Puccis' claim for punitive damages because the law of Pennsylvania does not recognize such a claim in the context of an action to enforce an insurance policy. In *Stack v. Nationwide Mutual Fire Insurance Co.*, 7 Pa.D. & C.3d 113 (C.P. of Lackawanna County 1978), the plaintiffs filed a complaint in assumpsit to recover on a fire insurance policy. In its answer, the insurer denied liability on the ground that the fire had been set intentionally. The plaintiffs then sought leave of court to amend their complaint to add a cause of action for punitive damages arising from the insurer's alleged bad faith in refusing to adjust and settle the claim.

The court of common pleas denied the motion to amend, stating that "[i]t is clear that the case law of Pennsylvania does not provide for a private cause of action for punitive damages for the alleged bad faith in settling and adjusting claims." *Id.* at 114. *Accord, Smith v. Harleysville Insurance Company*, 275 Pa.Super. 246, 418 A.2d 705, 706 (1980) (improvident to allow insured to convert breach of contract action into action for a malicious tort). The court also held that "the Unfair Insurance Practices Act, supra, does not provide for this private cause of action for punitive damages. Indeed, the fact that the statute in question sets forth administrative remedies to sanction the type of conduct alleged by plaintiffs indicates that plaintiffs are limited to these administrative remedies." 7 Pa.D. & C.3d at 114 (citation omitted). *Accord, D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, —— Pa. ——, 431 A.2d 966 (1981) (in action for failure to satisfy claim for property damage, court rejects count in trespass seeking dam-

ages for emotional distress and punitive damages for alleged bad faith conduct of insurer because Legislature did not create private right of action when it enacted Unfair Insurance Practices Act). Thus, the Puccis' counterclaim fails to state a claim upon which relief can be granted.

We will enter an appropriate order implementing our conclusions of law.