**In the Matter of Harold LEVINSKY, Fannie Levinsky and Albert Levinsky, a partnership t/a 1122 Realty Company, Debtors.**

**Bankruptcy No. 181–13387–16.**

United States Bankruptcy Court,
E. D. New York.

Sept. 22, 1982.

Sprague, Dwyer, Aspland & Tobin, P. C., Mineola, N. Y., for Long Island City Sav. & Loan Ass'n, for the motion; Joseph A. Mulé, Mineola, N. Y., of counsel.

Guggenheim & Untermeyer, New York City, for debtor/respondent, in opposition; Ephraim K. Leibowitz, New York City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is a motion made by the Long Island City Savings and Loan Association (the Bank), pursuant to section 1112(b) of the Bankruptcy Reform Act of 1978 (the Code),

11 U.S.C. § 1112(b), to dismiss the petition for relief filed by 1122 Realty Company (the Debtor), a partnership consisting of Harold and Albert Levinsky, and their mother Fannie Levinsky, as general partners, under Chapter 11 of the Code, 11 U.S.C. § 1101 *et seq.*, on the ground that the debtor filed its petition "in fraud of the bankruptcy court and with the intent to hinder, delay and defraud the debtor's creditors...." (Notice of Motion to Dismiss Chapter 11 Petition, dated November 30, 1981, p. 1) In the alternative, the Bank seeks an order pursuant to section 362(d), 11 U.S.C. § 362(d), granting relief from the stay imposed by the commencement of this bankruptcy proceeding.

The debtor, a partnership organized under the laws of New York, filed its petition for relief with this court on November 4, 1981. The movant is a secured creditor of the debtor which filed its claim in the amount of $614,132.96, representing the balance due and owing on a first mortgage held by the Bank on an apartment house owned by the debtor.

The Bank's motion was opposed by the debtor and, after oral argument, an evidentiary hearing was subsequently held. Thus, to set this matter in proper perspective, a summary of the pertinent facts follows.

The chronology of the events leading up to the present controversy begins nearly 30 years ago. In 1955, Harold and Albert Levinsky, together with their father, Samuel, built a 96-unit, six-story apartment house located at 1122 Ocean Avenue in Brooklyn, New York. They evidently held title in the name of Stratford Realty Corp., which obtained an $800,000 mortgage, secured by the property, from Bankers Trust Company on September 23, 1955. Bankers assigned the mortgage to Massachusetts Mutual Life Insurance Company on July 31, 1956. Massachusetts Mutual assigned it to the Comptroller of the State of New York as Trustee for the New York Retirement System on November 14, 1966. (Affidavit of Harold Levinsky sworn to December 14, 1981, pp. 1 and 2) By 1971, the balance due on the mortgage had been amortized to about

$500,000. Sometime during this period, title to the property had been transferred from Stratford to Harold, Albert and Fannie Levinsky (the Levinskys) as tenants in common.

In 1971, the Levinskys decided to refinance the mortgage and to obtain additional financing. In the summer of that year, through Kenneth M. Goldman (Goldman), a mortgage broker, they initiated negotiations with the Bank to refinance the mortgage and to increase it to $800,000. In order to avoid the strictures of the New York State Usury Laws, they formed a corporation called Brolev Realty Corporation (Brolev) and, on August 25, 1971, prepared an application for a loan with the Bank in that amount in the name of the corporation which they had formed solely for that purpose. The application (Respondent's Exhibit A) was signed by Albert Levinsky, on behalf of Brolev, and was sent to the Bank by Goldman on September 2, 1971 with a covering letter and a financial report on the property. (Respondent's Exhibits E and F) In the meantime, the Bank had ordered a credit report on Brolev from an entity known as Excelsior Investigation Services. (Tr. of January 25, 1982, afternoon session, p. 11) The report is dated September 3, 1971 and was marked in evidence as Respondent's Exhibit D.

According to the report, the three designated officers of Brolev were "Harold Levinsky, his brother, Albert and his mother, Fannie." It also contains the following statement:

"This is [*sic*] Nominee corp. [*sic*] financing will be obtained under this name, which will be [*sic*] refinancing of property at 1122 Ocean Ave ...."

On September 10, 1971, the Bank informed Goldman, by letter, that it had approved Brolev's loan application in the amount of $800,000. It sets forth the terms and conditions under which it would make the loan. It provided, *inter alia,* that the mortgage would be for a term of ten years at 8½% interest with payments of $6,667 monthly to cover principal and interest; that the loan would be made to Brolev

"whose principal officers are Harold Levinsky, Albert Levinsky and Mother, Fannie Levinsky"; and that a non-refundable commitment fee "of $16,000" would be paid on the issuance of the commitment. (Respondent's Exhibit B). On September 13, 1971, it was accepted by Harold and Albert Levinsky who appended their signatures to the letter.

On November 3, 1971, the mortgage closing took place and various documents were executed by the parties. Although they were apparently entered into "contemporaneously" (Tr., December 17, 1981, p. 3), I will discuss them in their logical order of sequence.

First, a full covenant and warranty deed to the property, dated November 3, 1971, was executed by the Levinskys, without consideration, to Brolev which was recorded in the office of the City Register, Kings County, by the City Title Insurance Company (City Title) on November 9, 1971 at 2:40 p. m. at Reel 518, pages 1863–64. (Movant's Exhibit 4) As noted above, this conveyance from the individuals to the corporation served to protect the Bank from the operation of the state's usury laws. (Tr., January 25, 1982, morning session, p. 25)

Second, Brolev, as obligor, executed a bond, dated November 3, 1971, in the sum of $321,988.95, to the Bank, as obligee, which recited the terms and conditions of repayment. (Movant's Exhibit 1) At the same time, a mortgage, in the same amount between Brolev, as mortgagor, and the Bank, as mortgagee, was executed as security for the bond. As with the deed, the mortgage was recorded in the Office of the City Register, Kings County, by City Title, on November 9, 1971 at 2:40 p. m., at Reel 518, pages 1867–71. (Movant's Exhibit 2)

Third, on the same date, the Comptroller of the State of New York, as trustee of the New York State Retirement System, executed and delivered to the Bank an assignment of the mortgage on the property which had originally been executed by Stratford to Bankers Trust and which had subsequently been assigned to him, in consideration of the payment to him of $478,-

511.05 which was evidently the balance due thereon. This instrument was recorded in the office of the City Register, Kings County, by City Title on November 9, 1971 at 2:40 p. m. at Reel 518, page 1866. (Exhibit A attached to the affidavit of Harold Levinsky, sworn to December 4, 1981)

Fourth, again, on the same day, the Bank and Brolev entered into a consolidation and extension agreement whereby the two mortgages, the original one between Stratford and Bankers Trust on which there was a balance of $478,011.05, and the new mortgage, executed by Brolev to the Bank in the sum of $321,988.95, were merged and consolidated to constitute one mortgage of $800,000 to be paid in monthly installments of $6,667 which included interest at 8½%. The agreement also provided that the entire principal balance remaining unpaid would be due and payable on November 1, 1981. This agreement too, was recorded in the office of the City Register, Kings County, by City Title on November 9, 1971 at 2:41 p. m. at Reel 518, pages 1872–78. (Movant's Exhibit 3)

The final transaction that occurred on November 3, 1971 was the execution of a bargain and sale deed by Brolev to Fannie, Herbert and Albert Levinsky. (Movant's Exhibit 5) In this instrument, also recorded at the same register's office on Reel 518, pages 1879–80, and by the same title company, the Levinskys, as officers of Brolev, reconveyed title to the property at 1122 Ocean Avenue from their corporation, Brolev, to themselves individually. This document was recorded at 2:41 p. m., or within a minute of the other recorded instruments discussed above.

It should be noted that an apparent discrepancy exists between the mortgage agreements signed on November 3. The original mortgage, in the amount of $321,-988.95, contains 28 covenants, together with an additional seven covenants contained in a rider attached to the mortgage, for a total of 35. (Movant's Exhibit 2) The twenty-eighth covenant was excised completely. Of the seven additional convenants, the thirty-first was crossed out. The text of this covenant is as follows:

"That the whole of the principal sum remaining unpaid shall become due forthwith at the option of the mortgagee, its successors or assigns, in the event that the mortgagor shall convey title to the premises described in this mortgage without the written consent of the mortgagee, its successors or assigns, thirty days prior to the proposed transfer, which consent will not be unreasonably withheld provided, however, that a refusal on the part of the mortgagee, its successors or assigns, to consent to such proposed transfer of title shall not be deemed unreasonable if the credit standing of the proposed grantee is not acceptable to the mortgagee, its successors or assigns, and the mortgagor hereby covenants and agrees to pay to the mortgagee, its successors or assigns the reasonable cost of conducting a credit investigation of the proposed grantee." (*Id.*)

The consolidation and extension agreement containing 18 printed covenants also had an additional eight covenants included as part of a rider. (Movant's Exhibit 3) The same provision numbered in this document as "22" which was crossed out in the mortgage clause quoted in full in the preceding paragraph, however, was not deleted here. A notation on the Bank's loan analysis sheet prepared for the Levinskys' loan application apparently approved the deletion of this transfer restriction clause. (*See* Respondent's Exhibit C; Tr., January 25, 1982, p. m., pp. 6–7)

For nearly ten years after the mortgage was entered into, no problem arose between the mortgagor and the mortgagee. All payments were made by the former without any default. (*See* Tr., January 25, 1982, p. m., p. 21) The property was maintained by the Levinskys in good condition with repairs being made as needed. (*See, e.g.,* Respondent's Exhibit S)

The consolidation and extension agreement between the Bank and Brolev provided that upon the maturation date of the mortgage on November 1, 1981, the balance of $614,132.86 would become due. Therefore, in apparent anticipation of this upcoming balloon payment, the Levinskys, through their mortgage broker, Goldman, initiated negotiations with the Bank concerning the possible refinancing of their mortgage as early as March 17, 1981. (Respondent's Exhibit L; Tr., February 16, 1982, p. 54) At that time, it was decided by the Bank's executive officers that it was "too early" to begin such negotiations. (Tr., January 25, 1982, a. m., p. 32)

During May, 1981, the Levinskys, through Goldman, again communicated with the Bank regarding the balloon payment. Charles R. Merkle, assistant vice president and manager of the Bank's mortgage servicing department, informed Goldman that it was still too premature to discuss the refinancing of the mortgage. (*Id.* at p. 35) Apparently, Merkle did, however, invite the Levinskys to make an offer to refinance their mortgage, but it seems that this offer was not followed up. (*Id.*) In July, Goldman spoke with Merkle concerning his inability to place a loan elsewhere. Then, on August 24, 1981, Goldman informed Merkle that the " 'owners [the Levinskys] can not pay the loan off; they can't refinance the loan elsewhere.' " (*Id.* at pp. 38–39) Goldman at this time also requested a meeting with the Bank's president.

On August 28, 1981, Merkle told Goldman that " 'there would be no extension of the loan and that we [the Bank] wanted the loan paid off.' " (*Id.* at 39) Further attempts by the Levinskys to negotiate with the Bank occurred during the month of September under the auspices of Allen Weiss, Esq. Merkle told Weiss that the Bank required the mortgage to be paid off or, in the alternative, the Bank would proceed with a foreclosure action. (*Id.* at pp. 41–42) Later during the month, Merkle called Weiss to confirm the above discussion. (*Id.* at p. 42)

During the pendency of their negotiations with the Bank, the Levinskys, on October 1, 1981, formed a general partnership, 1122 Realty Company, and filed a certificate to that effect with the office of the County Clerk of Kings County. (Movant's Exhibit 7) On the same day, they transferred their

interest in the premises at 1122 Ocean Avenue to the partnership. The building constitutes the only asset thereof. (Movant's Exhibit 6) Harold Levinsky testified at trial that the partnership was created for the purpose of avoiding certain inheritance contingencies in light of Fannie Levinsky's ill health and advanced age. (Tr., January 25, 1982, p. m., p. 67)

The Bank contends that the debtor's chapter 11 petition should be dismissed because it was filed in fraud of this court and to delay and hinder its creditors. Concerning the first claim, it alleges:

"The partnership was not established to supply any greater managerial expertise or any greater cash influx to bolster the apartment house and its operation.

"It was designed for one purpose and one purpose only: to bring my client within the jurisdiction of this Court for them, meaning the Levinskys, to fit some definitional purpose of a debtor under Chapter 11 and avail itself of the Chapter 11 reorganization plan." (Tr., February 8, 1982, p. 51)

It also asserts that the transfer from Brolev to the Levinskys, executed on November 3, 1971, violated the anti-transfer clause contained in the consolidation and extension mortgage agreement.

Harold Levinsky, in contrast, readily admitted that the debtor "certainly filed the Chapter 11 petition to prevent the [Bank] from foreclosing on its mortgage." (Affidavit of Harold Levinsky, sworn to December 14, 1981, p. 3) The debtor denies, however, that its chapter 11 was filed in bad faith.

The Bank's first contention requires the determination of whether the Levinskys, in filing their chapter 11 petition in the form of a partnership, perpetrated a fraud on this court.

■ The filing of a chapter 11 petition is intended to give business debtors a respite from impending liquidation; it serves as a "remedy for relief from financial distress," B. Weintraub & A. Resnick, *Bankruptcy Law Manual,* ¶ 8.07, p. 8–15, by permitting

the "rehabilitation of an ongoing business," *In re Spenard Ventures, Inc.,* 18 B.R. 164, 167, 8 B.C.D. 1032, 1034, 6 C.B.C.2d 156, 160 Bankr.L.Rep. (CCH) ¶ 68,585, p. 80,458, 80, 460 (Bkrtcy. Alaska 1982). As one court recently noted: ·

"Essentially, the purpose of any reorganization (or rehabilitation) proceeding is to preserve the assets of a debtor and save them from disastrous or premature sales, such as foreclosures, so that junior interests (such as junior mortgage holders, unsecured creditors, and the debtors) will receive the greatest possibility of preserving their rights to recovery/equity in the debtor's property." *In re Hollanger,* 15 B.R. 35, 45, 8 B.C.D. 365, 371, 5 C.B.C.2d 386, 397 (Bkrtcy.W.D.La.1981).

■ Correspondingly, the protections of chapter 11 equally extend to the creditors of the debtor. While granting the latter the time to restructure its debts in order to afford it a "fresh start," *In re The Alison Corp.,* 9 B.R. 827, 829, 7 B.C.D. 500, 501, 4 C.B.C.2d 199, 201 (Bkrtcy.S.D.Cal.1981), it gives the former the opportunity to avoid liquidation and foreclosure actions and thus ideally receive a greater return on their claims. This court is, of course, mindful of the fact that "[t]he preservation of business enterprises must not be at the expense of creditors ...." *In re Dutch Woodcraft Shops,* 14 F.Supp. 467, 469 (W.D.Mich.1935); *see also In re Diversified Leasing Services, Ltd.,* 4 B.C.D. 309, 312 (Bkrtcy.E.D.Tenn. 1978) ("One of the primary purposes of debtor rehabilitation ... is to preserve the going concern value of the debtor's business for the mutual benefit of the debtor and his creditors"). One bankruptcy jurist eloquently described the delicate balancing the court must perform in weighing the competing concerns of the creditor versus the debtor:

"The provisions of the Code dealing with rehabilitation and reorganization must be viewed as direct lineal descendents of a legal philosophy solidly embedded in American bankruptcy law .... [The origins of this law] disclose a common theme and objective: avoidance of

the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of the parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy." *In re Victory Construction Co.,* 9 B.R. 549, 558, 7 B.C.D. 257, 263, 3 C.B.C.2d 655, 666 (Bkrtcy.C.D.Cal.1981).

One of the preliminary questions a bankruptcy court must determine upon receipt of a chapter 11 petition is whether proper jurisdiction exists. The "principal consideration," observed one court, "always seems to be that the Act (or Code) not be 'abused by the extension of its privileges to those not within the contemplation of it.'" *In re Nancant, Inc.,* 8 B.R. 1005, 1008, 7 B.C.D. 410, 412 (Bkrtcy.D.Mass.1981) (citing *Mongiello Bros. Coal Corp. v. Houghtaling Properties, Inc.,* 309 F.2d 925, 930 (5th Cir. 1962)).

Under the Bankruptcy Act of 1898, as amended (the ACT), three chapters, X, XI and XII, former Title 11 §§ 501–926, were devoted to business reorganizations. Chapter XII, former Title 11, U.S.C. §§ 801–926, covered "Real Property Arrangements by Persons Other Than Corporations." Under section 406(6) of this chapter, former Title 11 U.S.C. § 806(6), a debtor was defined as:

" . . . . a person, *other than a corporation* as defined in this Act, who could become a bankrupt under section 4 of this Act, who files a petition under this chapter and who is the legal or equitable owner of real property . . . which is security for any debt . . . " (emphasis mine)

As a result of this restriction, attempts were often made under the Act to circumvent the jurisdictional strictures by means of ruses by which unqualified entities (corporations) would be transformed into eligible debtors. *See, e.g., In re Metropolitan Realty Corp.,* 433 F.2d 676 (5th Cir. 1970), *cert. denied,* 401 U.S. 1008, 91 S.Ct. 1251, 28 L.Ed.2d 544 (1971); *In re Francfair, Inc.,* 13 F.Supp. 513 (S.D.N.Y.1935). *But see In re Northland Construction Co.,* 560 F.2d 756 (7th Cir.), *rhrg. denied en banc* (1977).

In contrast to the Act, the Code has consolidated all three reorganization chapters into one chapter, 11. However, this chapter is not a "self contained" unit, for as section 103(a) of the Code, 11 U.S.C. § 103(a) provides, chapters 1, 3 and 5 are applicable to cases under chapter 11. King, "Chapter 11 of the 1978 Bankruptcy Code," 53 *Am.Bank L.J.* 107 (1979). It is in section 109(d), 11 U.S.C. 109(d), for example, that the Code delineates which entities are eligible to file a chapter 11 petition. That section provides simply:

"Only a person that may be a debtor under chapter 7 of this title, except a stockbroker or a commodity broker, and a railroad may be a debtor under chapter 11 of this title."

A "person" is defined in section 101(30), 11 U.S.C. § 101(30) as follows:

" 'person' includes individual, partnership, and corporation, but does not include governmental unit."

It is manifest that these provisions of the Code have eliminated the restriction contained in section 406(6) of the Act. However, it is still incumbent upon this court to distinguish between petitions filed by truly eligible debtors and those filed by ineligible ones. It has long been recognized that the organization of an entity for the "express purpose of taking advantage of reorganization provisions, in connection with other circumstances, justifies dismissal of the petition as not having been filed in good faith." 11 *Remington on Bankruptcy* "Corporate Reorganization" § 4464, p. 156 (1961).

■ The sources of the court's powers to scrutinize the eligibility of a debtor have been identified. First, the court has "inherent" power to control its own jurisdiction. *Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153, 158

(1936). Second, I agree with my former colleague, Judge Roy Babitt, that there now exists an "impressive judicial gloss that an indispensable ingredient of every petition filed in this court is that it be in good faith." *In re 299 Jack-Hemp Associates,* 20 B.R. 412, 413, 6 C.B.C.2d 762, 764 (Bkrtcy.S. D.N.Y.1982). Although chapter 11 does not overtly require good faith in the filing of a petition, this specification has been traced to section 1112(b), 11 U.S.C. § 1112(b). This section states:

"Except as provided in subsection (c) of this section, on request of a party in interest, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of additional time for filing another plan or a modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan; and

(9) termination of a plan by reason of the occurrence of a condition specified in the plan."

█ Under this provision, the court is granted "broad powers" to dismiss a chapter 11 petition filed in bad faith. B. Weintraub and A. Resnick, *Bankruptcy Law Manual,* ¶ 8.17, p. 8–47 (1980); *Continental*

*Illinois National Bank and Trust Company v. Century City, Inc. (In re Century City, Inc.),* 8 B.R. 25, 29 (Bkrtcy.D.N.J.1980) ("The power of the Court to dismiss a case when its jurisdiction has been improperly invoked is inherent in the bankruptcy court as a court of equity, guided by equitable doctrines and principles . . . ."); *In re Tolco Properties, Inc.,* 6 B.R. 482, 486, 6 B.C.D. 913, 915–916, 3 C.B.C.2d 100, 106, (Bkrtcy.E. D.Va.1980). Notwithstanding the nine clauses contained in section 1112(b), there is virtually unanimous agreement that this section is not exhaustive. *See, e.g., In re Pappas,* 17 B.R. 662, 666 (Bkrtcy.D.Mass. 1982); *In re Alton Telegraph Printing Co.,* 14 B.R. 238, 239, 8 B.C.D. 457, 458, 5 C.B. C.2d 236, 239 (Bkrtcy.S.D.Ill.1981); *In re Eden Associates,* 13 B.R. 578, 583, 7 B.C.D. 1190, 1193, 4 C.B.C.2d 1249, 1255 (Bkrtcy.S. D.N.Y.1981). Rather, what constitutes cause for dismissal is "subject to judicial discretion under the circumstances of each case." *In re Nancant, Inc.,* 8 B.R. at 1006, 7 B.C.D. at 411. As one court explained:

"Under the Code, to prevent misuse of the Chapter 11 remedy by debtors which are not bona fide business organizations filing to reorganize an ongoing enterprise, a petition may be dismissed pursuant to § 1112(b)." *In re Eden Associates,* 13 B.R. at 584, 7 B.C.D. at 1194, 4 C.B. C.2d at 1256.

Thus a form of merging has occurred between good faith and the court's power to protect its jurisdictional integrity from attempts to circumvent it. Some courts hold that in addition to the court's discretionary duty to inquire into the good faith of a chapter 11 petition filing, the court has "inherent power and duty to make such an inquiry." *In re G–2 Realty Trust,* 6 B.R. 549, 552, 6 B.C.D. 1072, 1074, 2 C.B.C.2d 1344, 1349 (Bkrtcy.D.Mass.1980); *see also In re Alton Telegraph Printing Co.,* 14 B.R. at 240, 8 B.C.D. at 458, 5 C.B.C.2d at 239.

The Bank claims that the debtor has committed a fraud against this court's jurisdiction by the Levinskys' transfer of their interest in the property at 1122 Ocean Avenue from themselves as individuals to them-

selves as partners in the form of 1122 Realty Company, a partnership. This transfer took place on October 1, 1981, slightly more than one month before the Levinskys, as the partnership, filed their chapter 11 petition for relief.

■ It is true that last minute changes in form by the debtor are subject to close scrutiny as possibly indicative of bad faith where such transformation serves to shield certain assets, *see, e.g., In re Mogul,* 17 B.R. 680, 681, 8 B.C.D. 1024, 1025 (Bkrtcy.M.D. Fla.1982), or to create a jurisdictional basis shortly before the petition is filed, *see, e.g., In re The Alison Corp., supra; In re Nancant, Inc., supra; In re G–2 Realty Trust, supra.* Yet, on the other hand, the courts will not blindly impute bad faith under such circumstances. *See, e.g., In re Mass,* 2 B.C.D. 973, 974 (B.C.D.Mass.1976) ("I am not prepared to say that in all cases a transfer of form to procure eligibility to file should not be recognized."); *In re Northland Construction Co., supra.* As one court observed in reviewing a petition hastily filed under section 77B of the Act:

"Whether it [good faith] exists in any case depends upon the facts and circumstances presented. No one evidentiary fact can ordinarily be given paramount weight in deciding the question. If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses . . . to mortgage foreclosure, and to invoke the operation of the act in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, upon a feasible basis . . . good faith cannot be denied." *Loeb Apartments, Inc. v. Malwitz (In re Loeb Apartments, Inc.),* 89 F.2d 461, 463 (7th Cir.), *rehrg. denied,* (1937).

It is clear, therefore, that the fact of recent transformation on the part of the chapter 11 debtor is only one of several factors that the court should consider in determining the presence or absence of good faith. Thus, I agree with the following observation:

"The known fear of personal involvement and the desire of individuals to protect personal assets from jurisdiction in a bankruptcy case is so great that the organization of a new entity by a partnership or individuals incident to the transfer of partnership or individual property to such new entity and the filing of a Chapter 11 petition, as here, is highly suspect as to jurisdiction over said entity and assets.

\*   \*   \*   \*   \*   \*

"Yet, the test is not merely whether a transfer of property and a change of entity occurred on the eve of the petition for relief under Chapter 11. Such a test would void all such actions occurring on the eve of filing . . . . The test suggested in *Shapiro* [*Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932) ] and its progeny seems to be whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been altered or eroded by the transfer and subsequent Chapter 11 filing." *Chattanooga Federal Savings and Loan Association v. Northwest Recreational Activities, Inc. (In re Northwest Recreational Activities, Inc.),* 4 B.R. 36, 42, 6 B.C.D. 164, 168–68A, 1 C.B.C.2d 713, 722 (Bkrtcy. N.D.Ga.1980).

■ Utilizing this test in the present case, I find that no substantive or procedural right of the Bank was in any way adversely affected by the transfer of the Levinskys' title in the property at 1122 Ocean Avenue to their partnership. Under New York law, no distinction is drawn between the liability of an individual and a general partner. Each partner is personally and individually liable for the entire amount of all partnership obligations, whether such obligations arise from tort or contract. *See* N.Y. Partnership Law §§ 24, 26, subd. 2 (McKinney 1948). Thus, the Levinskys remain as liable as partners for their debts as they were as individuals.

Additionally, the Levinskys gained no jurisdictional advantage under the bankruptcy laws by filing as a partnership. Pursuant to the dictates of chapter 11 and section 109(d) as discussed earlier, a partnership or individual is equally eligible to file a petition under chapter 11. *Crowell v. Twin Oaks Golf Course (In re Twin Oaks Golf Course)*, 16 B.R. 383, 8 B.C.D. 751, Bankr.L.Rep. (CCH) ¶ 68,539 p. 80,314 (Bkrtcy.W.D.Mich.1982).

In *Tolco Properties, supra,* for instance, the court found no bad faith in a situation in which the debtor-corporation's property was previously held by the corporation's president and wife as individuals just prior to their conveyance of the property to the corporation and the subsequent filing by the corporation of its chapter 11 petition. The court cited the fact that since the president and his wife·could have elected to file a chapter 11 petition as individuals or as a corporation, the debtor's secured creditors were in no way prejudiced. *In re Tolco Properties, Inc.,* 6 B.R. at 487, 6 B.C.D. at 916, 3 C.B.C.2d at 106–107, *see also Chattanooga Federal Savings and Loan Association v. Northwest Recreational Activities, Inc., supra.*

I find the Bank's reliance upon *In re Mallard Associates,* 475 F.Supp. 1045 (S.D. N.Y.1979), in its memorandum of law is misplaced. This case concerned an attempt by an *unqualified* debtor, a corporation, to garner proper jurisdiction under Chapter XII of the Act by changing itself into a qualified debtor, a partnership. Again, as noted above, the Levinskys were equally eligible under chapter 11 of the Code to file as individuals or as a partnership. They secured no jurisdictional advantage by effecting the change in form.

Concerning the Bank's claim that the filing by the Levinskys of their chapter 11 served to "delay, hinder and defraud" their creditors, I likewise find no support in the law.

The purpose of chapter 11 is, as mentioned earlier, to afford a deserving business debtor the opportunity to restructure debts as well as to reorganize the debtor's business operations, in order to give creditors the opportunity to reap a greater return on their claims. Vital to the fulfillment of this purpose is the requirement that the debtor must demonstrate good faith in all dealings with the court and with his or her creditors. *In re First Dade Corp.,* 17 B.R. 887, 890–91 (Bkrtcy.M.D.Fla.1982). The significance of good faith is aptly described in the following:

"Good faith, in the sense perceived by this court to have continued relevance, is merged into the power of the court to protect its jurisdictional integrity from schemes of improper petitioners seeking to circumvent jurisdictional restrictions and from petitioners with demonstrable frivolous purposes absent any economic reality." *Chattanooga Federal Savings and Loan Association v. Northwest Recreational Activities, Inc. (In re Northwest Recreational Activities Inc.),* 4 B.R. at 39, 6 B.C.D. at 166, 1 C.B.C.2d at 718.

Although not defined in chapter 11, there have been sundry attempts to outline the contours of the meaning of this term. To begin with, good faith has been interpreted to mean more than mere "[g]ood intentions." *See, e.g.,* 11 *Remington on Bankruptcy* "Corporate Reorganizations" § 4461, p. 153 (1961). It has been used as a synonym for "honesty of purpose." *In re Dutch Woodcraft Shops,* 14 F.Supp. at 469;· *see, e.g., In re Metropolitan Realty Corp.,* 433 F.2d at 678 (good faith implies "an honest intent").

The question of good faith must be "carefully considered." *Mongiello Bros. Coal Corp. v. Houghtaling Properties, Inc.,* 309 F.2d 925, 929 (5th Cir. 1962). In determining this question, it is my belief that the court should avoid "unnecessary rigidity" at this early stage and should rather employ an elastic approach to each case. *In re Eden Associates,* 13 B.R. at 584, 7 B.C.D. at 1194, 4 C.B.C.2d at 1256.

Since Elizabethan times, a property transfer made with the intent to hinder, delay or defraud creditors has been held to be fraudulent. Stat.Eliz., Chapter 5 (1570). As a result, it has long been the province of

the courts to screen out reorganization petitions filed for the purpose of delaying creditors. *See, e.g., In re Henderson,* 100 F.2d 820, 821 (5th Cir. 1938); *Sherman v. Collins, (In re Collins),* 75 F.2d 62 (8th Cir. 1934).

This process thus requires the examination of all the facts presented in a case. Among the factors considered in determining the question of good faith, the following have been considered: whether a legitimate business exists, *In re Mogul, supra;* whether there are any unsecured creditors, *In re Dutch Flat Investment Co.,* 6 B.R. 470, 6 B.C.D. 1134, 3 C.B.C.2d 136 (Bkrtcy.N.D. Cal.1980); whether the debtor has any equity in the property sought to be protected, *Southeast Bank v. Certified Mortgage Corp. (In re Certified Mortgage Corp.),* 17 B.R. 225 (Bkrtcy.M.D.Fla.1982); and whether adequate protection of the creditor's collateral exists, *Polkin, Inc. v. Lotus Investments, Inc. (In re Lotus Investments, Inc.),* 16 B.R. 592, Bankr.L.Rep. ¶ 68,576, p. 80,433 (Bkrtcy.S.D.Fla.1981).

In *Polkin,* for example, the debtor filed a chapter 11 petition several days before the scheduled sale of its sole asset pursuant to a foreclosure judgment. The principal of the debtor had previously bought the property from the seller and had given the latter a balloon purchase money mortgage to secure the balance of the purchase price. Six months later, the seller brought the foreclosure action. In close proximity to this occurrence, the principal subsequently transferred his interest in the property to a newly formed corporation which then filed the chapter 11 petition. In support of its finding of a lack of good faith in the debtor's chapter 11 filing, the court noted that there was no evidence to establish that the property was necessary to an effective reorganization of the debtor; that the transfer was made for an "unspecified tax purpose;" that the debtor failed to show that the plaintiff-creditors' interest in the property would be adequately protected; and that the conveyance of the property from the principals to the debtor corporation served any legitimate business purpose. *Id.* at 594–95, Bankr.L.Rep. ¶ 68,576 at 80,434–35.

In another case involving facts similar to those in the matter at hand, the court was confronted with a situation in which one month after the debtor was incorporated it filed for chapter 11 reorganization. During the previous year, the debtor's principal had purchased the property at issue in the case from the plaintiff-secured creditors with a downpayment and a secured note. This property was the sole asset of the debtor. The plaintiffs claimed that the debtor corporation was formed for no legitimate reason other than to file a chapter 11 petition and, second, to obtain a stay of the plaintiffs' pending foreclosure proceedings. At trial, the debtor demonstrated that it was formed on the advice of its attorney and accountant in light of the incorporator's uncertain health and that the principal believed that it would be in a better position to secure additional financing. The court found that the creditors failed to show a lack of good faith based on these facts. The court held:

> "The fact that the formation of [the debtor] and the transfer of the property to it does not materially hinder [the creditors] nor shelter assets from them tends to show that the incorporation and the transfer were neither made for an illegitimate purpose nor in bad faith." *In re Spenard Ventures, Inc.,* 18 B.R. at 167, 8 B.C.D. at 1034, 6 C.B.C.2d at 160, Bankr. L.Rep. (CCH) ¶ 68,585 at p. 80,460.

In the instant case, the formation of the debtor partnership by the Levinskys did not diminish their individual liability to the Bank under the partnership law of New York. They were never individually liable on the mortgages. In addition, other than the automatic protections afforded to a debtor upon filing a chapter 11 petition, the creditor here has not shown any attempt by the Levinskys to shelter assets or financial resources.

Furthermore, the absence of any substantial unsecured debts does not indicate the presence of bad faith despite the Bank's contention to the contrary. The court in *Spenard,* for instance, was confronted with a petition filed under chapter 11 which

lacked any unsecured creditors. It held that where a debtor can "feasibly develop a plan to satisfy [its] secured creditors, the absence of unsecured creditors does not ... of itself require a finding that the petition was filed in bad faith." 18 B.R. at 168, 6 C.B.C.2d at 161, Bankr.L.Rep. (CCH) ¶ 68,-585 at p. 80, 461. In *Alison*, however, the court, in finding bad faith, considered *in conjunction* with the absence of unsecured creditors the fact that the debtor corporation, formed two days before filing its chapter 11 petition, was designed to give the debtor's two sole shareholders the protections of chapter 11 without involving their other assets. *In re The Alison Corp.*, 9 B.R. at 829, 7 B.C.D. at 501, 4 C.B.C.2d at 200–201.

■ Similarly, the court in *Nancant, supra* in dismissing the debtor's chapter 11 petition cited the following factors *in addition* to the fact that the debtor listed only one unsecured creditor: (1) the transfer of property occurred on the eve of its filing a chapter 11 petition; (2) the transfer was from an unqualified debtor to a qualified debtor; and (3) the debtor was not an ongoing business entity and in fact had never operated as such. *Cf. In re Mogul, supra* (no good faith exists where debtor, lacking any debts of consequence or complexity requiring reorganization, was not engaged in business, had no employees, had no independent income and had concealed assets from creditors). Thus, although the courts will take the absence of unsecured creditors into account, this fact is in *no way controlling*. *See, e.g., In re Fast Food Properties, Ltd.*, 5 B.R. 539, 6 B.C.D. 909, 2 C.B.C.2d 1159 (Bkrtcy C.D.Cal.1980); *In re Dutch Flat Investment Co., supra; Continental Illinois National Bank and Trust Company v. Century City, Inc., supra.*

Neither can this court condemn the filing of this petition on the ground that it presumably was filed to forestall the Bank's foreclosure action. The preeminent purpose of chapter 11 is to give a debtor an extension of time to restructure debts. Thus, in the absence of any circumstances indicative of bad faith, I find no basis in the Code to dismiss this petition on this ground.

■ I also reject the Bank's claim of fraud concerning the Levinskys' reconveyance of the property at 1122 Ocean Avenue from Brolev to themselves as individuals, as recorded on November 9, 1971. (Movant's Exhibit 5). The Bank, in support of this contention, cites the anti-transfer provision of the consolidation and extension agreement (provision "22"), also recorded on November 9, 1971. (Movant's Exhibit 3) This assertion, however, is weakened by several important considerations. First, the Bank had clear notice that Brolev was at most a nominee corporation long before the loan was entered into. (Respondent's Exhibit D) In fact, it was for the Bank's protection that a nominee corporation was created by the Levinskys. Second, it is inconceivable how the Bank can claim to be defrauded here, when the document containing the anti-transfer covenant was recorded within one minute of the recording of the reconveyance instrument. In addition, both documents were recorded by the same title company at the same register's office. Another consideration is the irreconcilable contradiction between the consolidation and extension agreement, containing the anti-transfer clause, and the original mortgage in which the very same provision had been deleted. Both of these documents were also recorded within a minute of each other. It is thus clear to me that the reconveyance from Brolev to the Levinskys was part and parcel of the mortgage closing which took place on November 3, 1971. All of the documents referred to above were executed and then delivered to the representative of City Title for recording, for it is apparent that they were all recorded at the same time. I cannot credit the Bank's contention that for a period of ten years, from 1971 to 1981, it had no knowledge of the transfer and that if it had, it might have proceeded to foreclose its mortgage on that ground notwithstanding the fact that the Levinskys were meticulous in following the schedule of payments provided for therein and were maintaining the property in excellent condition.

■ It is also my judgment that the Bank is adequately protected. From the evidence adduced at trial, there was no showing that the property at 1122 Ocean Avenue was in any respect in jeopardy. On the contrary, according to the 1981 appraiser's report (Respondent's Exhibit S), the property is in an excellent state of repair. Nor was any evidence submitted to the effect that the apartment house was uninsured or, over the ten years during which the Bank's mortgage was in effect, that it has appreciably deteriorated in value. The debtor, in fact, presently has an equity in the property of at least $335,000. This figure is based on the 1981 appraisal made of the premises which estimated the property to be worth $950,000 from which I have subtracted the sum remaining on the mortgage.

A final point remains. Counsel for the Bank in his brief laments: "It is clear that this proceeding had been commenced [by the Levinskys' filing of their chapter 11 petition] solely to obtain the benefit of the automatic stay, prevent foreclosure and gain time to weather the uncertainties and volatility of the mortgage market." (Secured Creditor's Post-Hearing Memorandum of Law, p. 23) This court is very much aware of and sensitive to the present upheaval in the mortgage market and the plight of those banking institutions caught unprepared by the unprecedented surge in interest rates. It is, however, the very purpose of the bankruptcy laws and, in particular, chapter 11 proceedings, to give the deserving debtor the very freedoms and protections to which the Bank objects. It is only by affording the debtor such statutorily defined rights that it may be able to overcome its financial difficulties and protect its equity in the property by avoiding foreclosure and the disastrous effects of a forced sale.

The Bank's motion to dismiss the petition is therefore in all respects denied.

I also deny that part of the Bank's motion which requests relief from the automatic stay pursuant to section 362(d) of the Code, 11 U.S.C. § 362(d). This section provides that on the request of a party in interest the court may lift the automatic stay imposed by section 362(d):

"(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

"(2) with respect to a stay of an act against property, if—

"(A) the debtor does not have an equity in such property; and

"(B) such property is not necessary to an effective reorganization."

It is apparent to me, for the purpose of this motion, that (1) the Bank is adequately protected; (2) the debtor has a substantial equity in the property, and (3) it is necessary to an effective reorganization.

Settle order in accordance herewith within ten days.