In re Francis O'LOUGHLIN, Edward F. Carroll, Francis O'Loughlin and Edward F. Carroll, d/b/a R & R Realty, Debtors.

Bankruptcy Nos. 84-00446-HL, 84-00482-HL.

United States Bankruptcy Court, D. Massachusetts.

May 24, 1984.

Thomas J. Raftery, Raftery & Warren, Boston, Mass., for debtor/individuals and as partners of R & R.

Bernard P. Rome, Wasserman, Salter & Rome, Boston, Mass., for Chestnut Hill Mortg. Corp.

---

## FINDINGS AND RULINGS ON MOTION TO DISMISS THE ABOVE THREE CASES

HAROLD LAVIEN, Bankruptcy Judge.

Counsel, representing the first and second secured creditors on the business real estate and possibly the first or second secured creditors on the personal property used in the operation of the businesses, and, depending upon the value of the security, possibly the largest unsecured creditors seek to have the two individual and partnership Chapter 11's dismissed as having not been filed in good faith. They are joined in this request by counsel who may be the first secured creditor in the personal property in the laundromat and delicatessen operations. Other allegedly secured creditors, in either the business or individual assets, had filed motions to be relieved of the stays or were preparing to do so, although some of these latter may have been willing to enter into stipulations that would have allowed the debtor a short period of time to attempt to sell on his own some of the individual realty and, in one case, possibly to make periodic payments. None of those matters were gone into in greater detail because of the basic problem of the good faith of the filings. The basic controversy involves real estate comprising a one-story brick building having a laundromat and a delicatessen, operated by the debtors, and a third store which was rented to third parties. The real estate was purchased in April of 1982 and was undisputedly owned and in the name of the R & R Realty Trust, a nominee trust. There was some conflict as to whether the personal property and operation of the delicatessen and the laundromat were part of the trust, part of a partnership, or part of individually owned assets.

On March 26, 1984, the second mortgagee, Chestnut Hill Mortgage Corp., entered the premises under its security agreements to take possession, by virtue of a breach, of all of the personal property of the R & R Realty Trust; namely, the property in the laundromat and the delicatessen, with a view toward holding a public auction sale on April 3, 1984. Mr. Carroll refused to allow them to take peaceful possession but was, of course, informed of the intended exercise of the foreclosure rights under that security agreement, and was given a copy of the notice, which is Exhibit # 6. On March 29, 1984, the Trust was dissolved and so recorded in the Registry of Deeds, and the property reverted, under the Trust, to the individuals. On the following day, March 30th, the individuals filed their Chapter 11 bankruptcy petitions, and on April 6th, a further filing was made of the partnership bankruptcy. On March 29th, the Indian Head National Bank, the creditor holding security interests as a result of the purchase of the laundry equipment from Craig Supply Company, sent notice of default and its intention to repossess as of April 2nd. This notice was received by Mr. Carroll on March 30th and, according to him, was the sole cause and the first consideration of filing their individual and the partnership Chapter 11's.

Mr. Carroll testified that he was unaware, until he read in the Sunday paper, on March 31st, that Chestnut Hill Mortgage Corp. was intending to hold a public auction on April 3rd, 1984, and although he acknowledges that he was visited on March 26th, 1984 by counsel, the principal in Chestnut Hill Mortgage Corp., and a third person, who attempted to take possession, that he was not given any notice of the impending foreclosure, or of the public auction on April 3rd, or of the notice dated March 26th. I do not find any of this credible and do not believe that the parties, including counsel who visited him on March 26th to attempt to take peaceful possession, did not advise him of why they were there or did not leave with him the notice of March 26th. I find that all of this occurred and that the debtor was fully aware of the intention of Chestnut Hill Mortgage Corp. to conduct its sale on April 3rd, 1984, and that he received all of this notice on the visit of March 26th.

Section 1112(b) of the Code authorizes the Court to dismiss a Chapter 11 petition or to convert the case to one under

Chapter 7 for "cause," on the petition of a party in interest. Although that section sets out a list of circumstances constituting cause, that list is not exclusive. *See* § 102(3). The legislative history of § 1112(b) demonstrates the intent of Congress that the bankruptcy court retain broad equitable powers to dismiss petitions. Senate Report 95–989, 95th Cong. 2d Sess. 117 (1978); House Report 95–595, 95th Cong. 1st Sess. 405–406 (1977). Most courts that have faced the issue have held that bad faith in the filing of a petition constitutes cause for dismissal under § 1112(b). *See, e.g., In re Victory Construction Co., Inc.,* 9 B.R. 549, 558, 7 B.C.D. 257, 3 C.B.C.2d 655 (Bkrtcy.C.D. Calif.1981); *In re Tolco Properties, Inc.,* 6 B.R. 482, 6 B.C.D. 913, 3 C.B.C.2d 100, Bkr.L.Rptr. ¶ 67,699 (Bkrtcy.E.D.Va. 1980); *In re G–2 Realty Trust,* 6 B.R. 549, 552, 6 B.C.D. 1072, 2 C.B.C.2d 1344 (Bkrtcy.D.Mass.1980); *Cf. Shapiro v. Wilgus,* 287 U.S. 348, 53 S.Ct. 142, 77 L.Ed. 355 (1932) (interpreting the Uniform Fraudulent Conveyance Act and English common law). This Court agrees and holds that bad faith in filing a Chapter 11 petition may provide cause to dismiss a petition pursuant to § 1112(b). In addition, the United States District Court for the District of Alaska has held that the burden of proving good faith is on the debtor. *In re Teneb, Inc.,* No. A–80–129 Civil, slip op. at p. 3 (D.Alaska March 11, 1981).

*In re Spenard Ventures, Inc.,* 18 B.R. 164, 166, 6 C.B.C. 156, 159 (Bkrtcy.Alaska 1982).

 In this district, it is well established that a nominee trust is not a person and is ineligible to file a bankruptcy petition, *Nancy Cantor, Trustee of Cantor Manson Trust v. Wilbraham & Monson Academy,* 609 F.2d 32 (1st Cir.1979), so that the issue becomes, was the conversion or dissolution of the nominee trust in order to file a Chapter 11, an act of bad faith done to hinder and delay the creditors in providing a method of filing under the Bankruptcy Act and devoid of any real business purpose. *See, In re Norman Cohen,* 4 B.R. 201, 6 B.C.D. 358 (Bkrtcy.S.D.Fla.1980); *In re Treasure Island Trust,* 2 B.R. 332, 5 B.C.D. 1246 (Bkrtcy.M.D.Fla.1980); *In re Associated Developers Trust,* 2 B.C.D. 903 (D.Mass.1976); *In re G–2 Realty Trust,* 6 B.R. 549, 6 B.C.D. 1072, 2 Collier Bankruptcy cases, 1344 (Bkrtcy.D.Mass.1980); *In re Northwest Recreational Activities, Inc.,* 4 B.R. 36, 6 B.C.D. 164 (Bkrtcy.N.D.Ga.1980). As for the business purpose in dissolving the Trust, Carroll testified that as far back as January, 1983, he had been advised to dissolve the Trust; however, no credible reason had been given for so doing, and the only explanation offered was that it would be easier to obtain a loan. However, no such loan was obtained, and no evidence was presented that any lender declined to make a loan to the Trust and made as a condition the dissolution of the Trust. Further, if this advice went back as far as January, 1983, no explanation was given for the cancelling of the Trust three days after the attempted entry to foreclose and one day prior to the filing of the Chapter 11's. Further, and most convincing to this Court of the total lack of credibility of Mr. Carroll,[1] he testified on direct examination that he was unaware, on March 29th, when the Trust was dissolved, of the impending foreclosure sale by Chestnut Hill Mortgage Corp., and, indeed, the thought of filing the bankruptcy petition did not arise until he received, on March 30th, the notice from Indian Head, that it was seeking to repossess. In fact, the basic reason for filing was to stave off the Indian Head repossession. This testimony was then repeated several additional times. To make sure that there was absolutely no question about this witness' state of mind or knowledge, the Court repeated the question and received the same set of answers. The Court then showed the witness the petition and schedules in the Chapter 11's which included the signature of Mr. Carroll and

---

1. A copy of the transcript and a copy of this opinion will be forwarded to the United States Attorney.

the date of his signature, in his handwriting, *of March 29th*, the exact same date that the dissolution of the Trust was filed. The bankruptcy petition, therefore, had been prepared prior to the receipt of the notice from the Indian Head, which was not received until March 30th. Neither Carroll nor his attorney offered any explanation for this glaring contradiction and, in fact, Carroll's counsel sent the Court, after trial, the copy of what he considered to be a favorable case without seeking, at the same time, an opportunity to explain. It, thus, becomes manifest that the Trust dissolution and the bankruptcy filing were not two separate, unrelated acts but, rather, part of a single plan to delay the secured creditors without any redeeming business purpose.

This whole question of bad faith permeates the transactions between the debtors and Chestnut Hill Mortgage Corp. and Indian Head National Bank. The debtor, Mr. Carroll, testified that the businesses of the delicatessen and the laundromat were conducted as a partnership and that the personal property in the delicatessen and the laundromat belonged to the individuals or the partnership and never to the Trust. Moreover, aside from having taken title in the name of the Trust, the Trust was not anything that was particularly used in the business transaction of the two individuals.

Exhibit #3 shows a lease of the third store in the block as late as March 1, 1984 in the name of the Trust, and not the individuals. Then, we come to the personal property and the conduct of the business. The equipment used in the laundromat was, initially, purchased from Craig Supply, Inc. The accompanying security agreement, Exhibit #4, dated December 15, 1982, was signed by Mr. Carroll on behalf of the R & R Realty Trust to Craig Supply Company, Inc. A security agreement, dated March 9, 1983, in the name of R & R Realty, without the designation of trust, was signed by Edward Carroll and Francis O'Loughlin, to the Indian Head National Bank for the equipment in the laundromat, and a financing statement to Craig Supply Company, Inc., dated December 31, 1982, was signed

R & R Realty without the trust designation and the two individual signatures for additional laundry equipment. There was no evidence of any filing in City Hall in Boston or Brighton covering any d/b/a for the R & R Realty other than the Trust filing. On the other hand, there are recordings by the Trust to the Patriot Bank on April 23, 1983 and, on the same date, to the Chestnut Hill Mortgage Corp., covering, apparently, a now defunct operation by the debtors under the name of the Friendly Spa, including its furniture, fixtures, and goodwill. The debtors, in the name of the Trust, borrowed money from the Chestnut Hill Mortgage Corp., and signed security agreements dated December 27, 1983 covering all of the personal property in both the laundromat and the delicatessen, warranting that the Trust was the owner, free from any adverse liens, security interests or encumbrances, except for a first security interest held by Craig Supply Co., Inc. A similar security agreement was executed with the Patriot Bank for the delicatessen equipment, subject to a lease from Control Data Corporation, Exhibits #1 and #2. Despite the allegation of the debtor, it is clear, and this Court so finds, that not only was the real estate, but the individual businesses in the delicatessen and the laundromat and the personal property therein, were represented to be and were conducted in the name of the Trust.

The filing of the partnership is a further indication of the general purposes of the debtor to hinder and delay the creditors. When the Indian Head National Bank attempted to repossess, on April 2nd, they were prevented by Carroll on the basis that he and O'Loughlin had filed individual Chapter 11's. It was then pointed out that since he was alleging that the businesses were run by a partnership, that the automatic stays in the individual cases did not prevent the repossession of those items. Whereupon, the third Chapter 11, in the name of the partnership, was filed. The problems between Indian Head and the debtors were not of recent origin. In fact, at an earlier time, when Indian Head at-

tempted to foreclose, litigation resulted in the Suffolk Superior Court, which was terminated by a stipulation and order forbidding the debtors, should there be any further default, from interfering with the Indian Head National Bank's attempt to repossess the property. Needless to say, any such order or stipulation would not prevent the filing of a bankruptcy petition, but it presents additional evidence of what the real intentions were in the dissolving of the Trust and the filing of the Chapter 11's in the individual names.

■ All of this represents a lack of good faith on the part of the petitioners, and, when reinforced by the misrepresentation apparently deliberately made in their testimony before this Court, the Court is warranted in finding, and does find, bad faith on the part of the debtors in that the Trust was terminated for no purpose other than to allow the debtors to file these Chapter 11's, thereby delaying and hindering the enforcement of the claims of the various creditors, secured and unsecured. While that in itself, namely, the delay of the creditors, is of course, one of the standard reasons for filing Chapter 11's, combined with the other activities of the debtor, there is a showing of sufficient bad faith to warrant a cause for dismissal of these three Chapter 11 petitions.

Debtor's counsel cites the case of *In re Spenard Ventures, Inc.*, 18 B.R. 164, 6 C.B.C. 156 (Bkrtcy.D.Alaska 1982). That case does not disagree with the legal principles as set forth; in fact, much of the law stated herein is quoted from that opinion. However, in that case, the Court finds a business purpose and a lack of bad faith and, therefore, did not dismiss the proceedings, a matter considerably different from the situation we are presented with here. Moreover, the Court found in that case, as a matter of fact, that the forming of the corporation was a legitimate and prudent practice as it established the relative interests of the parties, in light of the uncertain health of one of the principals who had recently had a heart attack. There was a paucity of any evidence to indicate that the Chapter 11 filing was the cause of the formation of the corporation. A very significant fact distinguishing this case was that it was not necessary to form the corporation in that case in order to file the Chapter 11 while, of course, in this case it would have been impossible for the Trust to file a Chapter 11 unless it altered its legal makeup. *Nancy Cantor, Trustee of Cantor Manson Trust v. Wilbraham & Monson Academy*, 609 F.2d 32 (1st Cir. 1979).

Counsel for the Creditor's Committee very vigorously argued that despite the conduct of the debtor, and even if the Court were to find that the filing and the dissolution of the Trust were motivated solely or predominantly by a desire to prevent foreclosure and hinder the creditors, that the Court also should consider the fact that a dismissal of the Chapter 11's will result in liquidation and probably no recovery to the unsecured creditors while there exists the possibility that if the matter remains in Chapter 11, there can be a reorganization and some salvage for the unsecured creditors. Because the bad faith issue would make the other issues immaterial, the Court did not conduct a full evidentiary hearing on the various motions to be relieved of the stay. However, the very nature of the number of alleged secured creditors who were seeking to be relieved of the stay or had indicated that they were preparing to do so, dealing with both the individual assets and the Trust assets would indicate that, first of all, there had been no substantial interest in the assets made available by the individual filings. As to the business property, the debtor represented that his expert would testify that the real estate value was between $150,000 and $175,000 and the personal property involved have a value of $20,000 to $30,000. The secured creditor represented that his expert would give a fair market value, to the real estate, of $400,000, with a liquidation value of $340,000 to $350,000. The first and second mortgages, which also included the personal property, came to approximately $334,000. There were the additional claims on the personal property

of Indian Head and Control Data Corporation, so that there would appear to have been little or no equity under any reasonable potential valuation of the realty. Moreover, as previously noted, the secured creditor, on one of the individual properties, was preparing to foreclose and, on the other, had been willing to enter into a stipulation to give the debtor 60 days to try and sell the property, himself. The only positive indication was the most recently filed cash flow reports which indicated, without further analysis, a positive cash flow.

The Court, certainly would not be prepared at this stage of the record, to say that a reorganization was impossible. But, if that were to be the controlling argument then, realistically, bad faith in and of itself, could never be justification for dismissal of a Chapter 11. The creditors could always argue that the Court should overlook the conduct of the debtor, no matter how venial, because in Chapter 11, there might be some salvage for the unsecured creditors. Even here, it might be pointed out that as of the time of the hearing, although schedules and statement of affairs had not been filed, the debtor's list of the 20 largest individual creditors in his individual case was approximately five times the amount that he had testified to and included the bank that held the mortgage on Carroll's home. Just another example of the debtor's passing acquaintanceship with truthfulness. As the Supreme Court has noted, the cleansing aspects of bankruptcy were intended to help the *honest but unfortunate debtor*. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). This theme of the honest debtor is really the *sine qua non* on which the entire bankruptcy system rests. Without it, there could be no confidence or tolerance of the system. In *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), the United States Supreme Court, in reliance on *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554-5, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915) noted that:

One of the primary purposes of the bankruptcy act is to '*relieve the honest debtor* from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes'. (emphasis added)

The Courts have been strict with debtors who have abused the Bankruptcy Code and the Federal Courts. The Second Circuit in *Meyerson v. Werner*, 683 F.2d 723, 728 (1982) sustained a district court order requiring the debtor to dismiss a Chapter 11 filed in bad faith, based on a long history of the use of alter ego entities to avoid satisfying a judgment.

Motion to Dismiss these three petitions for having been filed in bad faith is ALLOWED.