**In re CLINTON CENTRIFUGE, INC., Debtor.**

**Bankruptcy No. 86–03950F.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 28, 1987.

Jonathan Ganz, H. Marvin Mercer, III, and Lewis Kates, Kates and Mazzicone, Philadelphia, Pa., co-counsel for debtor, Clinton Centrifuge, Inc.

· Melvin Lashner, J. Scott Victor, Lashner, Victor & Maschmeyer, Philadelphia, Pa., and Gregory L. Sturn, Harris & Harris, Warrington, Pa., for movants, Aaron M. Lavin, A.M. Lavin Machine Works, Inc. and Lavin Centrifuge, Inc.

## OPINION

BRUCE FOX, Bankruptcy Judge:

On August 21, 1986, the debtor, Clinton Centrifuge, Inc., filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On December 2, 1986, three creditors filed a motion to vacate the order for relief, asserting that the bankruptcy petition was filed in bad faith. An evidentiary hearing was held on the motion on January 7, 1987.

For the reasons set forth below, the motion will be denied.

## FINDINGS OF FACT

1. A.M. Lavin Machine Works, Inc. ("Machine Works") is a Pennsylvania corporation with its principal office at 3500 Davisville Road, Hatboro, Pennsylvania.

2. Aaron M. Lavin ("Lavin"), an individual residing at 3500 Davisville Road, Hatboro, Pennsylvania, is the sole stockholder and principal officer of Machine Works.

3. Lavin Centrifuge, Inc. ("Lavin Centrifuge") is a Pennsylvaina corporation with its principal place of business at 220 Jacksonville Road, Hatboro, Pennsylvania.

4. William D. Clinton, ("Clinton") is an individual residing at 313 Custis Road, Glenside, Pennsylvania.

5. Clinton Centrifuge, Inc., ("Clinton Centrifuge") is a Pennsylvania corporation with its registered office at 313 Custis Road, Glenside, Pennsylvania.

6. In 1980, Machine Works was engaged in the assembly, manufacture, sale and repair of basket-type centrifuges and other equipment, as well as the sale of certain spare parts.

7. Sometime in mid–1980, Lavin decided to sell his business, and Clinton became aware of this decision.

8. On October 10, 1980, Lavin and Machine Works entered into a written agreement with Clinton and Lavin Centrifuge, a corporation Clinton agreed to incorporate for the purpose of purchasing the assets

and conducting the business of Machine Works.

9. Under the agreement Lavin Centrifuge agreed to purchase Lavin Machine Works for:

a. $100,000.00 cash at settlement;

b. $1,000,000.00 balloon payment, payable on or before October 1, 1990, evidenced and secured by a judgment note;

c. minimum royalties of $120,000.00 per annum for ten years, payable at a monthly rate of $10,000.00 for 120 months; and

d. additional royalties payable each year of 3% of net sales over $1,000,000.00 per annum and payments to Machine Works of $85,403.00 plus interest, payable in fifty (50) equal monthly debt service payments of $2,000.00.

10. Lavin also agreed to rent to Lavin Centrifuge his industrial plant for the "net" rate of $2,000.00 per month on a month-to-month basis, and also to make available to Clinton a $100,000.00 line of credit for working capital funds to be advanced to Lavin Centrifuge.

11. The agreement also provides, in other pertinent part, with "CORPORATION" being Lavin Centrifuge:

CLINTON represents and warrant to LAVIN that from and after the closing, CLINTON will, until such time as all indebtedness under the terms of this Agreement is paid in full (whether or not there has been a default which has been cured pursuant to the terms hereof), maintain all of the shares of stock in the CORPORATION in escrow with Robert C.J. McKinstry, Owl Ridge Farm, Gardenville, PA 18962. In the event that the CORPORATION is in default and in the event that the said default is not cured within 180 days of written notice to the CORPORATION to cure the default, any and all stock held in escrow shall be delivered to LAVIN and LAVIN may in accordance with this Agreement have sufficient stock transferred from CLINTON to himself to cure said default-said stock being valued at its book value. CLINTON shall have a right thereafter within six (6) months to redeem said stock from LAVIN by curing the default. As long as CLINTON is not in default, CLINTON shall have the right to vote the stock and collect all dividends. However, in the event stock is transferred to LAVIN pursuant to the terms hereof, LAVIN shall have the right to vote the stock in his name and to collect all dividends issued on the stock in his name.

12. On October 14, 1980, Clinton caused Lavin Centrifuge to be incorporated, becoming its sole stockholder and chief executive officer.

13. On or about March 6, 1983, Clinton caused Clinton Centrifuge to be incorporated, and became its chief executive officer and sole stockholder.

14. Clinton Centrifuge was inactive until April 6, 1983.

15. On April 6, 1983, Clinton caused Lavin Centrifuge to sell all of its bulk assets, including inventory, equipment, accounts receivable, cash-on-hand, office furniture, pre-paid expenses, designs, drawings, engineering concepts, jigs, dies, fixtures, demonstration parts, assemblies, and patterns to Clinton Centrifuge in a bulk transfer in exchange for $135,787.00 in new consideration evidenced by a note payable in monthly installments over a five-year period.

16. Lavin Centrifuge mailed an original notice of bulk transfer to Lavin and Machine Works on or about March 25, 1983, and an amended notice of bulk transfer to Lavin and Machine Works on or about March 28, 1983, pursuant to Article 6 of the Pennsylvania Commercial Code.

17. After April 6, 1983, Lavin Centrifuge no longer made any sales or purchases, and no longer engaged in active business, although it remains a corporate entity with limited assets and extensive liabilities to Lavin and Machine Works.

18. On July 6, 1983, Aaron M. Lavin and A.M. Lavin Machine Works, Inc. commenced an action in equity, in the Court of Common Pleas of Montgomery County, No. 83–09836, to enjoin Lavin Centrifuge, Clinton Centrifuge, and Clinton from taking any actions inconsistent with the October 10, 1980 agreement.

19. On May 14, 1985, after four (4) days of trial, Judge Vogel of the Court of Common Pleas, entered an opinion, findings of fact, conclusions of law, and decree nisi, that held, *inter alia:*

a. that the bulk transfer of assets on April 6, 1983 from Lavin Centrifuge to Clinton Centrifuge be set aside as fraudulent pursuant to section 360 of the Fraudulent Conveyances Act, 39 P.S. Section 360;

b. that the transferred assets or their equivalent be returned to the control and dominion of Lavin Centrifuge;

c. that the profits generated by Clinton Centrifuge, as a result of its possession of the transferred assets, be returned to Lavin Centrifuge;

d. that ownership of all authorized and outstanding capital stock of Lavin Centrifuge be transferred and delivered to Lavin; and

e. that Lavin and Machine Works failed to prove that Clinton, Lavin Centrifuge and Clinton Centrifuge fraudulently misrepresented any facts concerning the agreement of sale among Lavin, Machine Works, Lavin Centrifuge and Clinton or concerning the April 6, 1983 bulk transfer.

20. On March 7, 1986, Judge Vogel entered a final decree on plaintiff's exceptions of May 24, 1985, and dismissed defendant's motion for post trial relief.

21. Clinton Centrifuge appealed the final decree of Judge Vogel to the Pennsylvania Superior Court.

22. On July 22, 1986, Judge Vogel entered an order on defendants' petition for stay pending appeal which ordered Clinton Centrifuge to post a bond with corporate surety in the sum of $225,000.00 within thirty (30) days of the order or the stay would be vacated.

23. The bond was never filed and a day after the expiration of the 30–day period this bankruptcy petition was filed.

24. Clinton has an unsecured claim listed on the schedules which is marked as undisputed in the amount of $10,300.00.

25. Guinard Centrifuge International is listed as a creditor in the undisputed amount of $22,400.000 for refunds of overcharges of administrative and consulting charges during 1985.

26. The law firm of Harris & Harris is listed as a creditor in the undisputed amount of $2,537.77.

27. Lavin is listed as a creditor with an unliquidated and disputed claim in excess of $134,000.00.

28. Wambold and Roberts, a CPA service, is listed as a creditor in the undisputed amount of $900.00.

29. Equipco, Inc. is a creditor with an undisputed claim of $9,608.99 and is listed on the debtor's amendment to schedules.

30. Clinton filed the chapter 11 bankruptcy in order to preserve the economic existence of Clinton Centrifuge, an ongoing business enterprise.

### CONCLUSIONS OF LAW

1. Clinton Centrifuge did not file this chapter 11 bankruptcy case in bad faith.

2. This bankruptcy case should not be dismissed under 11 U.S.C. § 1112(b).

### DISCUSSION

This motion raises questions which have troubled bankruptcy courts for some time and which are by no means frivolous. Based upon the facts set forth above, which are largely undisputed, Lavin, Machine Works and Lavin Centrifuge request that this chapter 11 bankruptcy case be dismissed. The movants contend that the filing of the voluntary bankruptcy petition was a litigation tactic on the part of Clinton Centrifuge designed to allow it to continue to contest an adverse state court decision without complying with the requirement that it post a supersedeas bond. As such, according to the movants, the bankruptcy was filed in bad faith and should be dismissed pursuant to 11 U.S.C. § 1112(b).[1]

---

1. Since this is a chapter 11 case, I need not decide if the meaning of good faith under chapter 11 is synonomous with its meaning under chapter 13. For a recent, detailed discussion of one approach to the issue under chapter 13, see *In re Gathright,* 67 B.R. 384 (Bankr.E.D.Pa. 1986).

There is no express language in the Bankruptcy Code requiring that a chapter 11 petition be filed in good faith. Nevertheless, many courts have held that the absence of good faith constitutes "cause" for dismissal under section 1112(b). *E.g., In re O'Loughlin,* 40 B.R. 707, 709 (Bankr. D.Mass.1984); *Matter of Northwest Recreational Activities, Inc.,* 4 B.R. 36, 39 (Bankr.N.D.Ga.1980). An implicit good faith requirement has also been found to exist based upon an inherent power to protect the court's jurisdictional integrity and to prevent fraud or abuse of the Bankruptcy Code. *E.g., Matter of Little Creek Development Corp.,* 779 F.2d 1068 (5th Cir. 1986); *In re Thirtieth Place, Inc.,* 30 B.R. 503 (Bankr. 9th Cir.1983); *In re Route 202 Corp.,* 37 B.R. 367 (Bankr.E.D.Pa.1984); *Matter of Levinsky,* 23 B.R. 210 (Bankr.E. D.N.Y.1982); *In re Spenard Ventures, Inc.,* 18 B.R. 164 (Bankr.D.Alaska 1982); *In re Eden Associates,* 13 B.R. 578 (Bankr. S.D.N.Y.1981); *In re Northwest Recreational Activities, Inc.*

The purpose of the good faith requirement was explained as follows in the seminal case of *In re Victory Construction Co.,* 9 B.R. 549 (Bankr.C.D.Cal.1981), *order vacated on other grounds,* 37 B.R. 222 (9th Cir.Bankr.1984):

> [Historically, the bankruptcy laws] disclose a common theme and objective: avoidance of the consequences of economic dismemberment and liquidation, and the preservation of ongoing values in a manner which does equity and is fair to rights and interests of parties affected. But the perimeters of this potential mark the borderline between fulfillment and perversion; between accomplishing the objectives of rehabilitation and reorganization, and the use of these statutory provisions to destroy and undermine the legitimate rights and interests of those intended to benefit by this statutory policy. That borderline is patrolled by courts of equity, armed with the doctrine of "good faith": the requirement that those who invoke the reorganization or rehabilitation provisions of the bankruptcy law must do so in a manner consistent with the aims and objectives of bankruptcy philosophy....

9 B.R. at 558 (footnote omitted). *See also Furness v. Lilienfield,* 35 B.R. 1006, 1011–12 (D.Md.1983).

There has been substantial litigation involving the good faith doctrine under chapter 11. Many courts have closely examined the debtor's conduct, especially prepetition, in evaluating good faith. In *Matter of Grieshop,* 63 B.R. 657 (N.D.Ind.1986), the district court summarized the methodology of these courts:

> In determining whether good faith exists in a given case, the court must consider all underlying facts and circumstances.... Thus, many cases have developed sets of factors which tend to recur in bankruptcy petitions in which good faith is an issue. As gleaned from the cases, bad faith may exist where:
>
> 1. The debtor has few or no unsecured creditors.
>
> 2. There has been a previous bankruptcy petition by the debtor or a related entity.
>
> 3. The pre-petition conduct of the debtor has been improper.
>
> 4. The petition effectively allows the debtor to evade court orders.
>
> 5. There are few debts to non-moving creditors.
>
> 6. The petition was filed on the eve of foreclosure.
>
> 7. The foreclosed property is the sole or major asset of the debtor.
>
> 8. The debtor has no ongoing business or employees.
>
> 9. There is no possibility of reorganization.
>
> 10. The debtor's income is not sufficient to operate.
>
> 11. There was no pressure from non-moving creditors.
>
> 12. Reorganization essentially involves the resolution of a two-party dispute.
>
> 13. A corporate debtor was formed and received title to its major assets immediately before the petition and
>
> 14. The debtor filed solely to create the automatic stay.

63 B.R. at 662–63 (citations omitted); *accord, In re Cooper Properties Liquidating*

*Trust, Inc.*, 61 B.R. 531, 536–37 (Bankr.W. D.Tenn.1986).

The foregoing analysis of good faith has also been criticized. One court has stated that "the term covers too many different kinds of conduct in too many different situations ... [and that] it is not a category at all, but merely a pejorative phrase, functioning at such a high level of abstraction that one can scarcely discern what might be underneath it." *In re Victory Construction Co.*, 42 B.R. 145 (Bankr.C.D.Cal. 1984). In *In re Johns-Manville*, 36 B.R. 727, 737 (Bankr.S.D.N.Y.1984), the court stated that, in the absence of an express statutory good faith requirement, the concept should be applied only on a "limited *ad hoc* basis." The court emphasized that the filing of a chapter 11 case creates a bankruptcy estate for the benefit of creditors as well as the debtors.

> The filing triggers the springing into existence of important constituencies which, along with the debtor, must be protected by a reorganization court. Accordingly, the intense focus on the debtor's motives in filing is misplaced.

*Id; accord, In re Cooper Properties Liquidating Trust* (motion to dismiss denied to protect interests of non-moving creditors).

 My review of the caselaw convinces me that the application of the good faith doctrine to a particular chapter 11 filing cannot be based upon a rigid utilization of specific factors, particularly those which focus on the debtor's prepetition conduct. In enacting chapter 11, Congress determined that an otherwise eligible debtor is entitled to an opportunity to reorganize; the Code's policy is .one of open access to the bankruptcy process. *See In re Johns-Manville Corp.*, 36 B.R. at 735–37. At the same time, Congress built procedural and substantive protections for creditors into the bankruptcy process. *E.g.*, 11 U.S.C. §§ 305, 362(d), 363(c), 1112(b), 1121(b), (c); 28 U.S.C. § 1334(c). In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other statutory enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended. When a debtor is motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case. *In re Route 202 Corp.; In re Spenard Ventures, Inc.* With these principles in mind, I turn to the case at bench.

In their memoranda of law, the parties have cited six bankruptcy court decisions which address the good faith of a debtor who, after appealing an adverse state court judgment without posting a supersedeas bond, then filed a chapter 11 petition.[2] In three of the cases, the courts found the filing to be in good faith and denied a motion to dismiss. *In re Corey*, 46 B.R. 31 (Bankr.D.Hawaii 1984); *In re McLaury*, 25 B.R. 30 (Bankr.N.D.Tex.1982); *In re Alton Telegraph Printing Co.*, 14 B.R. 238 (Bankr.S.D.Ill.1981). In the other three cases, the courts held the filing to be in bad faith. *In re Karum Group, Inc.*, 66 B.R. 436 (Bankr.W.D.Wash.1986); *In re Smith*, 58 B.R. 448 (Bankr.W.D.Ky.1986); *In re Wally Findley Galleries (New York)*, 36 B.R. 849 (Bankr.S.D.N.Y.1984).

The cases in which the courts found that the debtor had filed in good faith all engaged, in varying degrees, in an "on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." *Matter of Little Creek Development Corp.*, 779 F.2d 1068, 1072 (5th Cir.

---

**2.** The movants cite one other case, *Matter of Little Creek Development Corp.*, 779 F.2d 1068 (5th Cir.1986). However, in that case, the court of appeals reversed an order granting relief from the automatic stay for cause, the cause being the debtor's bad faith chapter 11 filing, and remanded the case for another hearing. The court concluded that the factual record did not support a finding of bad faith.

1986). *In Alton Telegraph*, the court noted that prior to the entry of the state court judgment, the debtor was an ongoing, viable business, employing a substantial number of persons. The court also observed that the debtor had filed a plan of reorganization and that the case was progressing in an "orderly and expeditious manner." 14 B.R. at 241. Similarly, the court in *McLaury* proceeded on the assumption that the "economic condition" of the debtor justified the use of the bankruptcy laws. 25 B.R. at 32. *Corey* differed somewhat in that it involved a debtor who intended to file a liquidating plan. *See* 11 U.S.C. § 1123(b)(4). The court accepted the debtor's argument that the reorganization process would allow her to marshal her assets and pay her creditors through an orderly liquidation. *See also In re Route 202 Corp.* (in evaluating good faith; liquidation under section 1123(b)(4) can be a legitimate purpose for a chapter 11 filing); *In re Spenard Ventures, Inc.* (same). In short, each of these decisions was grounded in a determination that the debtor's filing was consistent with a legitimate reorganization purpose and was based on economic reality.

By comparison, in *Wally Findlay Galleries*, the court made an explicit finding that the debtor would be unable to propose a plan of reorganization (apparently for economic reasons) unless it successfully relitigated in the bankruptcy court claims already determined in state court. Since the court concluded that relitigation of those issues was not permissible in the bankruptcy court, the case suggests that the court believed that reorganization was patently infeasible. In *Karum Group*, the court made an explicit finding, based on admission of the debtor's counsel, that the debtor intended to dismiss the bankruptcy if it prevailed in its state court appeal. The court found that the debtor had little, if any, intention to reorganize and filed its bankruptcy petition solely to delay execution of the state court judgment pending appeal.

This case differs materially from *Wally Findlay Galleries* and *Karum Group*. The former is distinguishable because there is no basis, on the record before me, to conclude that a reorganization (including liquidation) is an economic pipe dream. At this early stage of the case, such a finding is not favored. *Cf. In re 6200 Ridge, Inc.*, 69 B.R. 837, 843 (Bankr.E.D.Pa.1987) (involving section 362(d)(2)); *In re Monroe Well Service*, 67 B.R. 746 (Bankr.E.D.Pa. 1986) (involving injunction under section 105). Nor is there any evidence, as in *Karum Group*, to suggest that the debtor merely seeks delay and does not intend to utilize the reorganization provisions of the Code.

The rationale of *Smith*, the third case relied upon by the movants, is somewhat different. The court in *Smith* viewed the supersedeas bond requirement as a significant creature of state law designed to protect the legitimate interests of judgment creditors. The court concluded that "due regard for principles of federalism" mandated the conclusion that the use of chapter 11 as the functional equivalent of a supersedeas bond is "an abuse of process, state and federal." 58 B.R. at 451.

Certainly, a bankruptcy court must be conscious of principles of federalism. *Cf. In re Earle Industries, Inc.*, 72 B.R. 131, 133–35 (Bankr.E.D.Pa.1987) (involving abstention under 28 U.S.C. § 1334(c)(1)); 28 U.S.C. § 1334(c)(1) (authorizing abstention "in the interest of comity with State courts or respect for State law"). In my view, however, the court in *Smith* did not appreciate the significance of the various mechanisms in the Bankruptcy Code which also protect those "legitimate state ends" which the *Smith* court discussed.

Initially, it must be acknowledged that every bankruptcy filing affects the rights accorded creditors under state law. Creditors are automatically stayed from enforcing their claims in order to provide the debtor with a breathing spell. The very purpose of the automatic stay is to give a debtor a "breathing spell from his creditors" and time to "attempt a repayment or reorganization plan." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6296–6297; *see In re Cooper Properties Liquidating Trust*, 61 B.R. at 537 (purpose of chapter 11 is to provide time to debtor to

implement a plan "without the burden of impending litigation"); *Matter of Levinsky,* 23 B.R. at 221 ("preeminent purpose of chapter 11 is to give a debtor an extension of time to restructure debts"). Moreover, the Code gives the trustee (in a chapter 11 case, the debtor in possession) the power to reject certain contracts and avoid certain transfers which might otherwise be valid under state law. *See, e.g.,* 11 U.S.C. §§ 365, 522(f), 544, 545, 547, 548, 549. *See generally In re Koopmans,* 22 B.R. 395, 404 n. 17 (Bankr.D.Utah 1982) (describing the power to reject contracts and avoid liens as among the "tools of reorganization" for debtor that needs an "overhaul"). Thus, due recognition of creditors' property rights under state law is only the start of the analysis which must be undertaken by a bankruptcy court. *See In re Monroe Well Service,* 67 B.R. at 756 (creditor restrained from enforcing statutory lien, pursuant to section 105, after balancing of public interest in successful bankruptcy reorganization against state policy designed to insure payment to materialmen). *See generally In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, 373 (5th Cir.1987) (en banc) (noting that automatic stay and other Code provisions can become destructive of creditors' legitimate rights if reorganization is impossible or the debtor unreasonably delays).

At the same time, creditors holding an interest in the debtor's property have various protections under the Bankruptcy Code. For example, under sections 362(d) and 363(e), such a creditor is entitled to adequate protection of its interest in property.[3] *See In re Corey.* Similarly, if a debtor does not propose a reorganization plan within 120 days of the order for relief, the court might not extend the debtor's exclusivity period. *See In re McLaury. See generally In re Pine Run Trust;* 67 B.R. 432 (Bankr.E.D.Pa.1986). This may be an especially powerful creditor weapon in a case where the debtor has one major creditor and only a few, relatively minor, creditors.

Moreover, while a debtor may wish to relitigate in bankruptcy court issues pending in a prepetition state court appeal, it may not be free to do so.[4] In other words, movants are assuming that the continued existence of this chapter 11 bankruptcy case will adversely affect their rights as pronounced by state court in a manner contrary to the policies underlying the Bankruptcy Code. Specifically, movants assume that the bankruptcy filing, if not dismissed as a bad faith filing, will allow

**3.** The adequate protection requirement in bankruptcy and state bond requirements for stays pending appeal are comparable expressions of public policy. The movants in this case have not filed a motion seeking relief under sections 362 or 363 of the Code.

**4.** Such issues may lead to abstention. *See generally In re Earle Industries, Inc.,* 71 B.R. 131 (Bankr.E.D.Pa.1987). It also raises questions of issue and claim preclusion. As a general rule, these questions are determined by the preclusion law of the forum state. *Compare Jameson v. Bethlehem Steel Corp. Pension Plan,* 765 F.2d 49 (3d Cir.1985) *with In re Meade Land & Development Corp.,* 1 B.R. 279 (Bankr.E.D.Pa.1979). Federal courts interpreting Pennsylvania law have divided on the issue whether a judgment which is on appeal has sufficient finality to have a preclusive effect in an action in another court. *Compare Roodvelt v. Merrill Lynch, Pierce, Fenner & Smith,* 585 F.Supp. 770 (E.D.Pa.1984) (no preclusive effect); *United States v. Employers Mutual Liability Insurance Co.,* 495 F.Supp. 840 (W.D.Pa.1980); *In re Levitt,* 18 B.R. 598 (Bankr. E.D.Pa.1982); *with Commercial Union Assurance Co. v. Pucci,* 523 F.Supp. 1310 (W.D.Pa. 1981); *In re Meade Land & Development Corp.*

This division of authority arises because "the question ... has not been answered consistently" by the Pennsylvania courts. Annot., 9 A.L. R.2d 984, 999 (1950). *Compare Columbia National Bank v. Dunn,* 207 Pa. 548, 56 A. 1087 (1904) (judgment on appeal has no preclusive effect); *Souter v. Baymore,* 7 Pa. 415 (1847) *with Wallace's Estate,* 316 Pa. 148, 174 A. 397 (1934) (judgment, once entered, is preclusive "until reversed"); *Woodward v. Carson,* 86 Pa. 176 (1878); *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 325, 433 A.2d 620 (1981). The line of cases which support the proposition that a judgment on appeal is preclusive until reversed is in accord with the Restatement of Judgments 2d § 13, comment f (1982) and the original Restatement of Judgments § 41, comment d (1942). I note that the Pennsylvania Supreme Court has cited the original Restatement with approval. *See Keystone Building Corp. v. Lincoln Savings and Loan Association,* 468 Pa. 85, 360 A.2d 191, 195 n. 7 (1976) (citing comment c of the first Restatement). I need not reach this issue in ruling on the motion now before me.

the debtor to prosecute its appeal in the state appellate courts (or attempt to relitigate the matter de novo in this court) while simultaneously staying movants from exercising their rights.[5] In so assuming, movants overlook the rights they possess under the Code and may be misinterpreting this court's response to the state court's decision.

 In short, I do not find movant's argument and its reliance on the analysis in *Smith* persuasive. In evaluating the pending motion to dismiss, my narrow function is simply to determine whether movants have established that the debtor lacks a plausible, legitimate reorganization (or liquidation) purpose. On the record before me, I conclude that the burden has not been met. I am unwilling to conclude that the mere fact that the chapter 11 filing was triggered by state court proceedings adverse to the debtor constitutes by itself, bad faith. *See In re Route 202 Corp.* While the state court decision held that the debtor participated in a fraudulent conveyance, the court also ruled that the transferred assets "or their equivalent" should be returned. (Exhibit "A", state court opinion at 36). While no one can say, at this early stage of the case, whether the debtor can successfully reorganize (or liquidate) under chapter 11, particularly in the face of the hostility exhibited by some of its major creditors, the purpose of chapter 11 is to give the debtor that opportunity.[6] Prior to the filing, the debtor had an ongoing business, with several employees and several creditors other than the movants. The debtor's continued viability has been threatened by the claim successfully asserted in state court by Lavin and Machine Works. *See In re Johns-Manville.* In

these circumstances, and on this record, there is no basis to conclude that the case was filed "with demonstrable frivolous purposes absent any economic reality," *Matter of Northwest Recreational Activities, Inc.,* 4 B.R. at 39, or that "reorganization process is being perverted in this case," *Matter of Little Creek Development Corp.,* 779 F.2d at 1073.

For the reasons set forth above, the motion to dismiss will be denied. An order to that effect will be entered.

---

**5.** Since the debtor is the defendant in the underlying state court action, any appeal taken, even one filed by the debtor, is stayed. *Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir.1982).

**6.** The movants also argue that because the underlying litigation involved a fraudulent conveyance judgment, the debtor is attempting to use the bankruptcy court "as a shield to protect its adjudicated bad faith dealing pre-bankruptcy" and is the "sort of Debtor [who] does not belong in Bankruptcy Court." (Movants' Supplemental Memorandum of Law 8). I have already ob-

served that this kind of emphasis on the debtor's prepetition dealings is generally misplaced in a chapter 11 case. *See In re Johns-Manville Corp.* I note also that: (1) the underlying transfer was not conducted secretly, but was done with notice to the interested parties; (2) the movants attempted, unsuccessfully, in state court to enjoin the transfer before it was completed; (3) the state court expressly found that no actual fraud or misrepresentation was committed and that Clinton believed the bulk transfer was the best alternative for all parties due to the financial problems of Lavin Centrifuge.